645 F.Supp. 1055 (1986)
In re Criminal and Civil Contempt Proceedings Against Arthur N. ECONOMOU.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
The AMERICAN BOARD OF TRADE, INC., Arthur N. Economou, Phyllis H. Economou, and the American Board of Trade Service Corp., Defendants.
No. 83 Civ. 6213 (SWK).
United States District Court, S.D. New York.
October 8, 1986.
As Amended October 22, 1986.
Arthur N. Economou, New York City, pro se.
Ira Lee Sorkin, New York City, for S.E.C.
Milton Gould, Interim Receiver, New York City.

MEMORANDUM OPINION AND ORDER
KRAM, District Judge.
This criminal and civil contempt proceeding arises out of a civil action brought by the Securities and Exchange Commission ("SEC") against the American Board of Trade, Inc. ("ABT"), Arthur Economou, Phyllis Economou, and the American Board of Trade Service Corp. ("ABTS") to enjoin the sale of unregistered commercial paper by the defendants. The Court brought on this proceeding sua sponte after Mr. Economou made statements to the Court and to the Interim Receiver indicating that he had violated Court orders.
On September 2, 1986, this Court gave notice to Mr. Economou, pursuant to Fed. R.Crim.P. 42(b), that it would conduct a hearing on September 8, 1986, to determine whether to hold him in criminal contempt for violation of this Court's orders. 18 U.S.C. § 401(3). Specifically, the Court charged Mr. Economou with violating two of its orders. First, it charged Economou with violating its order of May 30, 1986 prohibiting ABT from redeeming commercial paper. Second, it charged Economou *1056 with violating its order of August 15, 1986 prohibiting the expenditure of ABT's commercial paper assets without approval from then Special Master Milton Gould. The Court also informed Mr. Economou that it would consider at the hearing whether to hold him in civil contempt as well. Mindful that Mr. Economou had been proceeding pro se in the civil action brought by the SEC, the Court also suggested that Mr. Economou retain counsel to defend himself against the contempt charges. Mr. Economou, however told the Court he preferred to proceed pro se.
On September 8, 1986, the morning the contempt proceedings were scheduled to begin, Mr. Economou informed the Court he did not understand the nature of the proceedings against him. The Court again informed Mr. Economou that he had a right to be represented by counsel, and suggested that he retain counsel. The Court also told Mr. Economou that it could appoint a lawyer to represent him if he could not afford counsel. Mr. Economou stated he could afford counsel but asked that counsel be appointed for him. He argued that since the Government had brought the civil action out of which this contempt proceeding arose, it was obliged to provide him with counsel in the contempt proceeding.[1] Mr. Economou also indicated that even if counsel were appointed, he would only use counsel to "assist" him, and would continue to represent himself pro se.[2] The Court agreed to adjourn the hearing, and sent Mr. Economou to the Magistrate's part to seek CJA counsel.[3]
Mr. Economou, however, failed to disclose information about the value of his assets on the CJA affidavit. The Court held a conference on September 9, 1986, and informed Mr. Economou that since he had refused to fill out the affidavit, CJA counsel would not be appointed for him. The Court adjourned the contempt hearing once again, and advised Mr. Economou that if he did not retain counsel, he would have to proceed pro se.
The hearing on the contempt charges finally commenced on September 11, 1986.[4] Mr. Economou appeared without counsel, and once again, the Court informed him that he should retain counsel to represent himself. The Court also described the ways in which counsel could assist Mr. Economou. Once again, however, Mr. Economou stated that he desired to proceed pro se. The Court, after further questioning Mr. Economou about his decision, found that his desire to proceed pro se was knowing and voluntary. The Court then informed Mr. Economou of his Fifth Amendment rights, the burden of proof in a criminal case, and his rights to introduce or object to evidence and to confront any witnesses against him.
The Court conducted the hearing on September 11, 16, 17, and 22, 1986. The Court *1057 heard extensive testimony from Mr. Economou, Mrs. Economou and Benjamin Bayoneto, ABT's accountant.[5] The Court had an opportunity to observe their demeanor and assess their credibility. The following constitutes the Court's findings of fact and conclusions of law.

I. CRIMINAL CONTEMPT
In order to determine whether Mr. Economou is guilty of criminal contempt, the Court must find beyond a reasonable doubt that the Court gave Mr. Economou a clear order, that Mr. Economou had actual knowledge of the order, that Mr. Economou violated the order, and that Mr. Economou acted willfully and knowingly in disobeying the order.

A. Count 1

The Court's first charge against Mr. Economou is that he violated this Court's order of May 30, 1986, prohibiting him from redeeming commercial paper. On May 30, 1986, this Court entered an order in the underlying civil action which states in pertinent part: "the Court orders defendants to cease the redemption of maturing commercial paper immediately." (Court Exhibit 1.) On July 18, 1986, the Court of Appeals for the Second Circuit issued an order which reads in pertinent part: "[o]n June 10, 1986, we granted [ABT's] motion for a stay pending an appeal of the District Court's order enjoining all redemptions and sales of unregistered notes by defendants. That stay is hereby lifted." (Court Exhibit 2.) The orders of both this Court and the Court of Appeals are clear and unequivocal. Both order ABT, ABTS, and Mr. and Mrs. Economou to cease the redemption of commercial paper immediately. Thus, as of July 18, 1986, Mr. Economou was prohibited from redeeming commercial paper.
*1058 This Court informed Mr. Economou personally of its May 30 order. Mrs. Economou testified that she learned of the Second Circuit's order by telephone on July 18, 1986, and informed Mr. Economou of the order on the same day. Mr. Economou testified he knew of both orders as well. Mr. Economou, in fact, did not place his knowledge of the orders in issue.
Mr. Economou does not dispute that commercial paper was redeemed after July 18, 1986. In fact, he submitted an affidavit to the Court which states that the commercial paper of 34 customers was redeemed after July 18, 1986, and lists the precise amount of each redemption. See Declaration of Arthur N. Economou in opposition to the motion by the Securities and Exchange Commission for the appointment of a receiver, ¶ 7 and Exhibit E. The exhibit indicates that $175,000 was redeemed.
Mr. Economou claims, however, that he personally did not disobey the order. Mr. Economou relies strongly on Mrs. Economou's testimony that she alone decided to redeem the commercial paper. This testimony contradicts her own testimony as well as other evidence in the case. Mrs. Economou, Mr. Economou, and Benjamin Bayoneto each testified that Mrs. Economou told Mr. Economou after July 18, 1986 that she was redeeming paper, and that Mr. Economou approved what she was doing. The evidence also indicates that Mrs. Economou and Mr. Economou both decided to redeem the paper in the first instance. While Mrs. Economou developed and implemented the plan for redemption, it is clear from the evidence that Mr. Economou approved the redemption, and that the redemption would not have occurred without Mr. Economou's approval. Furthermore, the evidence indicates that Mr. Economou knew commercial paper was being redeemed and could have prevented it.[6] Thus, he disobeyed and disregarded the Court orders prohibiting redemption.
Mrs. Economou's testimony that she alone decided to redeem ABT commercial paper also contradicts a sworn statement Mr. Economou made in a prior proceeding. Mr. Economou, responding to the Court's question about the redemption of commercial paper after July 18, 1986, stated "I did it....". (Court Exhibit 3.)[7] Mrs. Economou's statement that she alone decided to redeem the paper is further brought into question by her interest in protecting her husband. Of course, she was placing herself in jeopardy by testifying as she did, but the Court finds that her demeanor and evasiveness while testifying about Mr. Economou's role in the redemptions indicate that she was attempting to protect her husband.
In short, the Court finds that based on all the evidence adduced at this hearing, Mr. Economou himself disobeyed the Court's order by redeeming commercial paper after July 18, 1986.
Regarding the fourth element, that Mr. Economou acted knowingly and willfully when he disregarded the Court order prohibiting the redemption of commercial paper as of July 18, 1986, Mr. Economou essentially asserts the defense of good faith compliance with the order.
The testimony indicates that on June 30, 1986, the SEC, the U.S. Attorney, and the Post Office, acting pursuant to a search warrant, seized all of ABT's records. Included in those records were disposition instructions for commercial paper scheduled to mature in the near future. Without disposition instructions, ABT could not redeem paper as it came due. On July 18, 1986, when the Second Circuit affirmed this *1059 Court's stay on redemptions, ABT had not yet redeemed any paper that came due between July 1, 1986, and July 17, 1986 if the disposition instructions had been seized. Nevertheless, Mr. and Mrs. Economou, claiming that they believed this stay did not apply to commercial paper which had matured prior to July 18, 1986, but which was not redeemed prior to July 18, redeemed this paper after July 18, 1986.
It is clear the Economous understood that the order prohibited the redemption of commercial paper as of July 18, 1986. The redemption checks for the paper redeemed after July 18, 1986 are backdated to the date the paper matured. ABT did not redeem commercial paper that matured after July 18, 1986, regardless of whether the disposition instructions had been seized. Finally, ABT did not redeem commercial paper which matured before July 18 if disposition instructions were received after July 18.
It is clear from the evidence that Mr. Economou knowingly and willfully violated clear orders of this Court and the Second Circuit prohibiting the redemption of commercial paper as of July 18, 1986. He understood the order, and consciously disobeyed it. Even if Mr. Economou did, in fact, construe the Second Circuit order in the way he claims, he did not act in good faith in violating the order. He did not seek the Court's permission to redeem the paper that matured prior to July 18, 1986, but for which the disposition instructions were unavailable until after July 18, 1986. Nor can he argue that the orders were subject to the interpretation he gave them. The letter of the orders clearly prohibit the redemption of commercial paper without exception. The purpose of this Court's order prohibiting the redemption of paper  of which Economou was aware  was to prevent the further depletion of ABT commercial paper assets, and to allow the fairest distribution possible of ABT assets to commercial paper holders should ABT's business ultimately be terminated. In light of this, Mr. Economou's interpretation of this Order is wholly unjustified.[8]
The Court thus finds Economou guilty, beyond a reasonable doubt, of criminal contempt on the first count.

B. Count 2

On August 15, 1986, the Court issued two orders, the first freezing all of ABT's commercial paper assets, and the second prohibiting the disbursement of these assets without permission from the Master. (Court Exhibits 3 and 4.) Economou testified, and the Court finds, that despite his knowledge of this order, he willfully and knowingly ordered the expenditure of ABT commercial paper assets for the distribution of Bulletin No. 2 on August 19, 1986. (Court Exhibit 6.)[9]
*1060 Economou defended these expenditures as follows. First, he testified that he did not use ABT funds for postage but rather used credit on a postage meter used by one of ABT's affiliates. The Court finds that credit on a postage meter is an asset. Mr. Economou also testified that he personally intended to pay for the printing and envelope expenses. He testified that the bill for printing arrived after he sent out the Bulletin, and that he paid it. The testimony indicates that postage and printing cost $2,600 each. Mr. Economou also testified that the bill for the envelopes has not yet arrived.
Mr. Economou's testimony regarding his intentions is belied by the fact that he used ABT funds to pay the postage. Furthermore, even if the Court believes his testimony, which it does not, it is clear that $2,600 in ABT funds was expended on mailing Bulletin No. 2.
The Court thus finds Economou guilty, beyond a reasonable doubt, of criminal contempt on the second count. Sentencing on both counts is reserved pending a further hearing.

II. CIVIL CONTEMPT
The Court has already concluded that Mr. Economou violated its clear orders, and has found him guilty of criminal contempt on both counts. Economou's violations are particularly disturbing to the Court. By redeeming commercial paper after July 18, 1986, Economou depleted the pool of money that would be available to commercial paperholders should ABT be wound-down. The assets used for Bulletin No. 2 similarly would have been used to compensate paperholders.
In order to remedy this contempt, the Court orders Economou to repay to ABT's commercial program, out of his personal assets, all assets expended in violation of this Court's orders. This totals approximately $175,000 for the commercial paper that was redeemed illegally, and at least $7,800 for the mailing of Bulletin No. 2.[10]
SO ORDERED.
NOTES
[1] The Court found the argument that counsel should be appointed for Economou simply because the Government had brought a civil action against him frivolous, and refused to appoint counsel. Furthermore, the criminal contempt proceeding was brought on by the Court, not the SEC.
[2] Mr. Economou's intentions in retaining counsel for "assistance" as opposed to representation raised questions in the Court's mind as to the seriousness of his request for counsel and counsel's potential effectiveness. The Court recognizes that Mr. Economou has represented himself throughout the civil proceeding. He has appeared and argued in court, filed affidavits, exhibits, and legal briefs, and has been an effective and independent advocate. He has consistently stated that he performs better without counsel. Although a criminal case differs from a civil case, it is clear to the Court that Mr. Economou is knowledgeable about the law and able to defend himself.
[3] Although Mr. Economou told the Court that he could afford counsel, and Mrs. Economou has stated on the record that they have substantial savings, the Court felt it should allow Economou an opportunity to show he was eligible for counsel under Section VI. B of the Southern District's Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act.
[4] At the hearing, the Court examined Mr. Economou regarding the charge against him and introduced exhibits. The Court also asked the SEC and the Receiver to examine Mr. Economou, examine any other relevant witnesses, and present any evidence in their possession. The Court did not appoint the SEC or the Receiver as private prosecutors in this proceeding.
[5] During the course of the hearing, a number of issues arose which merit discussion.

First, Mrs. Economou, who is a defendant in the civil action, had been represented therein first by Paul Batista and then by the law firm of Comer and Myerson, both of whom were released and relieved as counsel prior to the contempt hearing. She thus began to represent herself pro se. When the Court learned Mrs. Economou planned to testify on Mr. Economou's behalf, the Court advised her to retain counsel. She did not, however, retain counsel, and she testified without counsel on September 16, 1986. On September 17, Mrs. Economou notified the Court that she wished to retain counsel. The Court agreed to adjourn her cross-examination until September 18, so that she could hire an attorney. On September 18, Mrs. Economou appeared in Court with an attorney, who requested a further adjournment of the hearing so that he could prepare. The Court granted the adjournment until September 22. On September 22, Mrs. Economou's counsel requested that her testimony be stricken from the record since she was not represented by counsel when she gave it. The Court denied that request, ruling first, that because Mrs. Economou was not a defendant in the contempt proceeding, she was not entitled to counsel, and second, that she had waived any right to have counsel present during her direct testimony by testifying after the Court advised her to retain counsel. Finally, in the middle of Mrs. Economou's cross-examination, her attorney suggested she should assert her Fifth Amendment privilege. The Court ruled that if she did assert such a privilege, the Court would not compel her to testify. Nevertheless, Mrs. Economou continued to answer questions.
Second, Mr. Economou sought to examine several witnesses during the course of the contempt proceedings, including Receiver Milton Gould, his associate, his secretary, and various SEC attorneys. The Court asked Mr. Economou for a proffer of evidence as to each witness, and found that the testimony would be irrelevant, and prohibited the testimony.
Third, during the course of the proceedings, the Court learned that Mr. Economou sent a third Bulletin to commercial paper holders disparaging the Court. The Court warned Mr. Economou that even though he is not an attorney, he is representing himself in this case, and the Court would hold him to the same standards expected of an attorney. The Court warned Economou to cease the disparaging communications. Based on the Court's awareness of Mr. Economou's derogatory statements, Mr. Economou asked the Court to recuse itself in the contempt proceeding. The Court refused, indicating that these remarks did not prejudice the Court's consideration of the charges against him and that the Court was not trying Mr. Economou for making the disparaging remarks. Fed. R.Crim.P. 42(b).
Fourth, Mr. Economou has released counsel for ABT and ABTS, the corporate defendants in the underlying civil action. He has not retained new counsel for them. In light of these actions, the Receiver has indicated that he will either retain counsel for the corporate defendants or represent their interests himself.
[6] The Court has also had an opportunity to learn about ABT's business and observe Mr. Economou through its close monitoring of this case over the last three years. Mr. Economou has been in Court and testified at countless hearings and conferences, and has submitted many affidavits to the Court. It is clear to the Court that Mr. Economou, as president and founder of ABT, is involved in all the significant decisions regarding ABT. The decision to redeem $175,000 worth of commercial paper after the freeze on redemption was in place is certainly a significant decision.
[7] This statement is admissible against Mr. Economou pursuant to Fed.R.Evid. 801(a)(2).
[8] Mr. Economou makes much of the fact that in affirming this Court's preliminary injunction against the issuance or redemption of commercial paper, the Second Circuit criticized the U.S. Attorney for failing to inform the Magistrate that a stay was in place, and ABT was operating as an ongoing business. The Second Circuit indicated that in light of this, the Magistrate might have ordered that the records be copied. Mr. Economou's reliance is misplaced, however, as the Second Circuit's opinion was issued well after his decision to redeem the paper. Furthermore, as mentioned earlier, Mr. Economou should have sought guidance from this Court before he redeemed the paper.
[9] During the course of the hearing, evidence was disclosed that ABT issued a number of other communications to shareholders without prior authorization for the disbursement from Mr. Gould. One of these, Bulletin No. 3, contained disparaging remarks about the Court, as described earlier. It also contained a number of blatant misrepresentations about the course and status of the underlying litigation. The Receiver informed the Court that hundreds of noteholders were contacting him, and based on the false statements contained in Bulletin No. 3, were very confused about the true status of the litigation. Based on that, the Court prohibited ABT, and Mr. and Mrs. Economou personally, from distributing any further bulletins or written notices to commercial paperholders without prior review by the Receiver. The Court, in making this decision, was fully aware of Mr. Economou's First Amendment rights, but believed that prior authorization was the only way to prevent further false and disruptive communications to noteholders.
[10] In order to remedy the contempt for mailing Bulletin No. 2, Mr. Economou may pay $2,600 for the postage or offer documentary proof that he has paid for it, and offer documentary proof to the Court that he has personally paid for the printing and the envelopes. The Court orders Mr. Economou to submit a proposed payment schedule and an affidavit describing all of his personal assets, wherever located and in whatever form.