**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

**v.**

**The AMERICAN BOARD OF TRADE, INC., Arthur N. Economou, Phyllis H. Economou, the American Board of Trade Service Corp., Defendants-Appellants.**

**Nos. 1159–1162, Dockets 86–6210, 87–6006, 87–6014, 87–6016.**

United States Court of Appeals, Second Circuit.

Argued June 1, 1987.

Decided Sept. 28, 1987.

Arthur N. Economou, defendant-appellant pro se.

Phyllis H. Economou, defendant-appellant pro se.

Eric Summergrad, Asst. Gen. Counsel, S.E.C., Washington, D.C. (Daniel L. Goelzer, Gen. Counsel, Paul Gonson, Sol., Jacob H. Stillman, Associate Gen. Counsel, Caryn A. Miller, Special Counsel, Sheila M. Barry, S.E.C.), for plaintiff-appellee.

Milton S. Gould, New York City, special master and receiver of defendants-appellants The American Bd. of Trade, Inc., et al.

Before NEWMAN, CARDAMONE and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This decision is yet another encounter with this case, *see SEC v. American Bd. of Trade, Inc.*, 751 F.2d 529 (2d Cir.1984) ("*ABT I*"); *SEC v. American Bd. of Trade, Inc.*, 798 F.2d 45 (2d Cir.1986) (per curiam) ("*ABT II*"), which itself is only a chapter in the litigious history of the appellants Arthur N. Economou, Phyllis H. Economou and firms they control. *See, e.g., Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), *vacating Economou v. United States Dep't of Agric.*, 535 F.2d 688 (2d Cir.1976); *CFTC v. American Bd. of Trade, Inc.*, 803 F.2d 1242 (2d Cir.1986), *aff'g* 473 F.Supp. 1177 (S.D.N.Y. 1979); *Economou v. United States Dep't of Agric.*, 494 F.2d 519 (2d Cir.1974) (per curiam); *Economou v. Wade*, 515 F.Supp. 813 (S.D.Iowa 1980); *American Bd. of Trade, Inc. v. American Stock Exch., Inc.*, 430 F.Supp. 655 (S.D.N.Y.1977); *American Bd. of Trade, Inc. v. Bagley,* 402 F.Supp. 974 (S.D.N.Y.1975).

In these consolidated appeals, the Economous contend that Judge Kram erred when she: (1) appointed a receiver for defendant companies and their affiliates; (2) entered a preliminary injunction freezing $500,000 of the Economous' assets; (3) held Arthur Economou in criminal contempt; (4) in an apparently unique ruling, *sua sponte* held Mr. Economou in civil contempt; (5) enjoined the Economous from communicating with noteholders of ABT entities without the prior approval of the court; (6) denied Arthur Economou's motions for leave to intervene as a plaintiff on behalf of various entities placed in receivership; and (7) denied appellants' motion to amend their answer. We dismiss the appeal from the denial of their motion to amend. In all other respects, we affirm.

## BACKGROUND

*ABT I,* familiarity with which is assumed, held that appellants were violating Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (1982), by selling unregistered securities in the form of short-term unsecured notes issued by The American Board of Trade Service Corp. ("ABT Service") and distributed by The American Board of Trade, Inc. ("ABT"). We nevertheless directed Judge Kram on remand to stay her injunction against further sales of such notes ("commercial paper" in the appellants' lexicon) in order to provide appellants with the opportunity to register ABT Service's notes with the SEC.

On that remand, however, it became apparent that ABT Service's inability to provide certified financial statements for years prior to *ABT I,* and for some time thereafter, precluded the corporations from registering their notes. In addition, the financial data provided to the district court demonstrated that ABT and ABT Service were grossly insolvent. Although incomplete, the data showed that the companies' liabilities exceeded their assets by at least $35 million and that the defendants were incurring substantial operating losses. Moreover, the companies were applying the proceeds from the continuing sales of notes to cover those operating losses. ABT Service was investing the proceeds of new commercial paper sales in certificates of deposit and bank accounts paying interest at rates that were 1–½ to 2 percentage points lower than the rates at which it was paying interest to its noteholders. During the period of time between our decision in 1984 and May 1986, the total amount of notes outstanding increased by approximately $20.6 million, while total liquid assets increased by only $6.3 million. Continued losses were thus a virtual certainty unless covered by ever larger sales of new notes.

Faced with an ongoing Ponzi scheme, the district court on May 30, 1986 lifted the stay of the injunction against defendants' sales of notes. In addition, the court enjoined defendants from redeeming previously issued notes pending both an examination of defendants' financial condition by

a court-appointed master and the proposal by the master of a plan for the distribution of defendants' assets. On June 10, 1986, we stayed the district court's injunction against sales and redemptions until an expedited appeal could be heard. We vacated this stay on July 18, 1986, the day after oral argument, and on August 8 affirmed the order of the district court. *ABT II,* 798 F.2d at 45.

After we had lifted our stay, Judge Kram concluded that an injunction against further sales and redemptions would not suffice to protect the noteholders. Because ABT Service lacked sufficient income to cover its operating expenses, its assets were being continually depleted. Accordingly, on August 8, 1986, the district court issued a temporary restraining order freezing all assets of the notes program and directing Arthur Economou to file an affidavit with the court listing all expenditures by the ABT entities since June 1986. Shortly thereafter, on August 13, Mr. Economou filed with the court an affidavit that listed disbursements since July 1 of approximately $5 million, a figure that appeared greatly to exceed ABT Service's income. The SEC then moved for the appointment of a limited receiver with power to approve or to disapprove expenditures by the ABT firms. On August 15, the court set a briefing schedule on the SEC's request and, in light of the ABT entities' "gross insolvency," continued losses, and failure to maintain adequate records, entered a preliminary injunction continuing the freeze of notes program assets pending the issuance of the Master's report. *SEC v. American Bd. of Trade, Inc.,* 645 F.Supp. 1047, 1051 (S.D.N.Y.1986) ("*ABT III*"). The court also ordered defendants to obtain the Master's approval for any checks written by the corporations.

Mr. Economou subsequently failed to cooperate with the Special Master's efforts to approve expenditures for the defendant companies. In addition, on August 14 and August 22, 1986, Mr. Economou used funds in an ABT Service account to mail notices to ABT noteholders. In light of these events, the SEC sought the appointment of a full receiver for the ABT entities. This request was granted on September 2, when the district court ordered a freeze of the assets of the ABT entities and appointed Mr. Gould as receiver with full control of the ABT entities pending his report to the court on a plan for distributing ABT assets to the noteholders. *Id.* at 1053–54. In appointing a receiver, the court found that the defendants had continued to expend corporate assets in violation of the court's express orders. In particular, Judge Kram found that after we had lifted our stay of the injunction against note redemptions, Mr. Economou had nevertheless redeemed a large number of notes. *Id.* at 1052. The district court also found that, despite its orders freezing assets of the notes program, Mr. Economou had used such assets to print and distribute to noteholders a bulletin concerning this case. *Id.* Finally, the court found that Mr. Economou was unable to provide an adequate explanation for a number of large transfers of cash from the notes program to other ABT entities in violation of the freeze order.

During the hearing on September 2, the district court announced that it would conduct a hearing on whether civil and criminal contempt sanctions should be imposed on Mr. Economou. Because no party had moved for such relief, the initiation of civil contempt proceedings was *sua sponte.* After a five-day hearing, the court on October 8 held Mr. Economou in both civil contempt and criminal contempt of court. *In re Economou,* 645 F.Supp. 1055, 1057–60 (S.D.N.Y.1986). As a civil contempt remedy, the court ordered Mr. Economou to make restitution to the ABT entities in the sum of $182,800—$175,000 for the redeemed notes and $7,800 for mailing expenditures in violation of the asset freeze. *Id.* at 1060. The court also fined Mr. Economou $2,000 for criminal contempt.

Meanwhile, the document that Mr. Economou had caused to be mailed to ABT noteholders became the subject of still further controversy before the district court. Styled "Bulletin No. 2" and addressed to "all ABT commercial paper customers," the document contained a bitter attack upon the SEC and its handling of the ABT litiga-

tion. The first sentence of the Bulletin charged that "the SEC over the past three years has deliberately contrived and implemented a violently hostile, Mafia-oriented type of combative posture versus the ABT exchange and marketplace and against me [Arthur N. Economou], personally." The Bulletin accused the SEC of seeking to destroy ABT and the Economous in order to protect the competitive position of "the old-line stock and commodity exchanges" and claimed that the SEC had maliciously withheld its approval of ABT's registration statements. Bulletin No. 2 did not inform its audience that ABT's inability to register its commercial paper program was due to its own failure to provide certified financial data concerning the program. The Bulletin also did not mention that such financial data would have revealed that ABT and its related entities were hopelessly insolvent and were operating a Ponzi scheme. Instead, readers of Bulletin No. 2 were told that "the enthusiasm for ABT's market-making system evidenced by the public gave it the go-ahead to raise $10 billion to $20 billion to establish a full-fledged National Market System for stock trading," and that "the vision of 1,000 ABT Investment Centers across the country was no longer an 'impossible dream.' It was about to become stark reality."

Yet another pamphlet, "Bulletin No. 3," set forth an "Optimum Plan" for the redemption of all ABT commercial paper through the registration and public offering of $230 million in equity securities. Bulletin No. 3 did not discuss how such a registration could occur in light of the legal history and financial condition of the notes program.

These communications caused ABT noteholders to inundate Special Master Gould with hundreds of letters and telephone calls demanding information about ABT's proposed registrations and about the SEC's purported obstruction of ABT's efforts to register its commercial paper. Because his duty to communicate with the noteholders had become enormously complicated by the Bulletins, on September 8, 1986 the Special Master asked the district court to order the Economous not to send any additional communications to the noteholders unless and until such communications were submitted to and approved by the court. This request was granted.

Finally, on October 21, the district court, noting that Mr. Economou had obtained personal loans from ABT entities amounting to approximately $500,000, issued a temporary restraining order freezing $500,000 of the Economous' personal assets until a final determination could be made as to whether the assets in fact belonged to ABT. On November 6, 1986, the court preliminarily enjoined the expenditure of these funds. Meanwhile, the Special Master and Receiver had submitted his report and recommendations to the court on November 5. Relying on a report prepared by Cooper & Lybrand, Mr. Gould reported that the ABT entities were "grossly insolvent," having $30,028,183 in total assets and $85,340,628 in total liabilities (including $79,167,481 in notes liabilities). Mr. Gould recommended the dissolution of the ABT entities and proposed a plan of distribution of their assets to noteholders and other creditors. His recommendations were adopted by Judge Kram virtually in their entirety on February 2, 1987. *SEC v. American Bd. of Trade*, 654 F.Supp. 361 (S.D.N.Y. 1987) ("*ABT IV*").

## DISCUSSION

### I

The Economous contend that the district court erred when it appointed an interim receiver for the ABT entities. They argue that the district court's decision was based upon misrepresentations and falsifications by the SEC, and that the district court could not have properly concluded from the evidence before it that the ABT entities were grossly insolvent. We disagree. There is absolutely no credible evidence either supporting the allegations of SEC misconduct or contradicting the conclusion that the ABT entities were hopelessly insolvent. Similarly, the district court's conclusion that the assets of the ABT entities were being inexplicably depleted during the weeks preceding the ap-

pointment of the receiver is clearly supported by the record.

Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists, *see, e.g., Lankenau v. Coggeshall & Hicks,* 350 F.2d 61, 63 (2d Cir. 1965), where necessary to prevent the dissipation of a defendant's assets pending further action by the court. In *Esbitt v. Dutch-American Mercantile Corp.,* 335 F.2d 141, 143 (2d Cir.1964), for example, we observed that "[a] primary purpose of appointing a receiver is to conserve the existing estate." Similarly, in *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1105 (2d Cir.1972), we stated that "the appointment of a trustee to help preserve the status quo while the various transactions were unraveled was necessary to obtain an accurate picture of what transpired." Although we have warned that "the appointment of trustees [or receivers] should not follow requests by the SEC as a matter of course," *id.,* a district court's decision to appoint a trustee or receiver may be disturbed on appeal only if the district court has abused its discretion. *See, e.g., SEC v. Alan F. Hughes, Inc.,* 461 F.2d 974, 983 (2d Cir.1972); *cf. SEC v. An-Car Oil Co.,* 604 F.2d 114 (1st Cir.1979) (reviewing district court's refusal to terminate receivership). In light of the ABT entities' deteriorating financial condition, their failure before and after *ABT I* to maintain adequate financial records, and the unexplained dissipation of their assets, there was no abuse of discretion in the appointment of an interim receiver "to prevent the further diversion of [ABT's] commercial paper assets." *ABT III,* 645 F.Supp. at 1053.

We are, however, disturbed by the subsequent use of the receivership to effect the liquidation of the ABT entities. On February 2, 1987, the district court adopted the Special Master's recommendation that he should be authorized in his capacity as Receiver to dissolve the ABT entities and to distribute their assets. *ABT IV,* 654 F.Supp. at 363. Although the Economous did not appeal from the district court's order of February 2, that order is sufficiently linked to the appointment of an interim receiver to warrant a brief expression of our views on the liquidation.

We have in the past criticized the use of receivers to effect the liquidiation of a defendant firm in litigation under the Securities Act or the Securities Exchange Act. For example, in *Esbitt v. Dutch-American Mercantile Corp.,* we held that a district court could exercise jurisdiction over a suit brought by a receiver assigned to marshal the assets of an insolvent corporation in an enforcement action brought by the SEC. 335 F.2d at 142. Nevertheless, we expressed misgivings about the particular use to which the receiver had been put:

> This is not to say that we approve the use of an equity receivership to perform the functions of the bankruptcy court. The record plainly indicates that the First Discount Corporation is hopelessly insolvent and is in the process (almost completed) of liquidation. We see no reason why violation of the Securities Act should result in the liquidation of an insolvent corporation via an equity receivership instead of the normal bankruptcy procedures, which are much better designed to protect the rights of interested parties.

*Id.* at 143 (citations omitted). We did not order the filing of a bankruptcy petition, however, because "the receivership has progressed almost to completion without objection and it would apparently not be in the interests of the parties to direct that further proceedings be diverted into bankruptcy channels." *Id.*

On several other occasions we repeated our view that equity receiverships should not be used to effect the liquidation of defendants in actions brought under the securities laws. For example, in affirming the appointment of a receiver in *SEC v. S & P National Corp.,* 360 F.2d 741, 750–51 (2d Cir.1966), we observed:

> If the only purpose of the receivership were to bring about a quick liquidation, we might feel otherwise; ... But the primary purpose of the appointment was promptly to install a responsible officer

of the court who could bring the companies into compliance with the law, "ascertain the true state of affairs ... and report thereon" to the court and the public shareholders and preserve the corporate assets. Therefore, liquidation was not the purpose of the court's action; if anything, liquidation is temporarily hindered. Until such time as a more informed decision can be made as to the desirability of liquidation, the receivership should not be disturbed.

(citations omitted). Similarly, in *Lankenau v. Coggeshall & Hicks,* we stated that "receiverships ancillary to SEC actions against brokers or broker-dealers should not be continued, in a case involving insolvency, beyond the point necessary to get the estate into the proper forum for liquidation—the bankruptcy court." 350 F.2d at 63. Notwithstanding our oft-repeated view on the matter, however, we have never vacated or modified a receivership order on the ground that a district court had improperly attempted to effect a liquidation. The reason we have acquiesced in the past, of course, is that by the time the issue had reached us, the liquidation was usually near termination, and claimants could not benefit from the initiation of bankruptcy proceedings.

However, the functions undertaken by the district court in this case demonstrate the wisdom of not using a receivership as a substitute for bankruptcy. As set out in detail in the margin,[1] the district court es-

1. For example, the following recommendations of the Special Master were adopted by the district court:

1. The Court should authorize the Special Master to distribute a summary of this Report (to be approved by the Court) to all known creditors and customers of the ABT Entities, together with a notice which establishes an appropriate period in which all interested parties may submit to the Court comments concerning the Report and the recommendations set forth herein, specifically including the question whether T-bill customers and spot commodity customers are entitled to priority over other investors and creditors of the ABT Entities. The notice should also establish a hearing date upon which the Court will consider the Special Master's recommendations and invite all interested parties to participate. (A proposed summary and notice for the Court's consideration is annexed hereto as Exhibit N.)

2. The ABT Entities should continue in receivership and the receiver should be authorized to dissolve the ABT Entities and distribute their assets. In this connection, the receiver should continue to discover and marshal the assets of the companies with a view toward maximizing the assets available for distribution to the ABT Entities' customers and creditors.

3. As soon as practicable after ruling upon the recommendations set forth herein, the Court should authorize the receiver to notify all customers and creditors of the ABT Entities that they must file with the receiver a statement establishing their claims against the ABT Entities by a date certain (the "bar date").

4. Upon the expiration of the bar date, the receiver should be empowered promptly to create a reserve fund consisting of (i) $1,507,652 in Treasury Bills specifically allocated to individual customers, (ii) commodities (valued at market prices by Coopers & Lybrand at $916,901) allocated to customers' spot positions, and (iii) $1,000,000 for administrative expenses and other contingencies. When the reserve fund has been established, the receiver should be directed to make an initial distribution of the balance of the ABT Entities' liquid assets to the companies' customers (including commercial paper holders) and creditors on a *pro rata* basis. When the receiver has liquidated all of the assets of the ABT Entities and discharged all of the companies' administrative responsibilities, the Court should authorize the receiver to make a final distribution to the ABT Entities' customers and creditors, also on a *pro rata* basis.

5. The Court should authorize the receiver to retain a broker to offer the ABT Entities' building at 9 South William Street, New York, New York, for sale.

6. If the Court concludes, after hearing, that T-Bill customers are entitled to priority over other customers and creditors of the ABT Entities, it should authorize the receiver to make appropriate distribution to holders of T-Bills.

7. If the Court concludes, after hearing, that spot commodities customers are entitled to priority over other customers and creditors of the ABT Entities, it should authorize the receiver to make appropriate distribution to commodity owners.

8. Subject to the order of the District Court in the CFTC proceeding (*see* discussion at Section II[E], *supra*), the receiver should maintain the $336,936.26 certificate of deposit at the Bank of Tokyo & Trust Company until maturity and, at that time, distribute its proceeds in accordance with the plan of distribution developed for all the other assets of the ABT Entities.

9. Because the ABT Entities are still incurring expenses associated with the existence of

sentially transformed itself into a court of bankruptcy aided by a receiver performing the tasks of a bankruptcy trustee. For example, the court has taken upon itself the burden of processing proof-of-claim forms filed by thousands of noteholders and other creditors, of setting priorities among classes of creditors, and of administering sales of real property, all without the aid of either the experience of a bankruptcy judge or the guidance of the bankruptcy code. Nevertheless, because it appears once again that the liquidation is well underway—indeed, the bar date for the filing of claims was April 1, 1987—we conclude, as we did in *Esbitt,* that it "would ... not be in the interests of the parties to direct that further proceedings be diverted into bankruptcy channels." 335 F.2d at 143. Accordingly, we affirm the district court's appointment of a receiver for the ABT entities. We now state, however, that in actions of the present kind brought in the future by the SEC, we expect counsel for the agency, as an officer of the court and as part of his or her individual professional responsibility, to bring our views, as stated in this and other decisions, to the attention of the district court before the court embarks on a liquidation through an equity receivership.

II

The Economous next argue that the district court erred when it entered a preliminary injunction freezing $500,000 of their personal assets until it could be determined whether they owed that amount to ABT entities.[2] Again, we disagree.

District courts possess broad equitable powers to grant "ancillary relief ... where necessary and proper to effectuate the purposes of" the securities laws, *see, e.g., SEC v. Materia,* 745 F.2d 197, 200 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307–08 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), including the impoundment of assets. For example, in *International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed. 2d 236 (1974), we upheld an injunction against the disposition of a large block of securities owned by a defendant because the securities would be a "critical asset" in the event that plaintiff were to prevail on its claims, *id.* at 1351, and because the "[s]ale of the stock would only aggravate the alleged fraud." *Id.*

Judge Kram certainly did not abuse her discretion in ordering a freeze of the Economous' personal assets. The SEC offered substantial evidence that Mr. Economou did in fact owe $500,000 to the ABT entities. Indeed, the Economous admit

ABT's facilities in Burlington, Vermont and Concord, New Hampshire, the Court should authorize the receiver to close down those facilities, and to arrange for the surrender of their respective leases and the sale of the furniture and equipment maintained there, including the airplane and automobiles.

10. The Court should direct the receiver to make monthly reports to the Court and the parties concerning his progress in implementing the recommendations approved by the Court.

These recommendations were adopted by Judge Kram virtually in their entirety. *ABT IV,* 654 F.Supp. at 361.

2. The SEC contends that we should not address this issue because the Economous have filed a notice of appeal from the district court's temporary restraining order of October 21, 1986 but not from the preliminary injunction of November 6. We disagree, however, and conclude that we may properly review the preliminary injunction order. Although Rule 3(c) of the Federal Rules of Appellate Procedure provides that an appellant must "designate the judgment, order or part thereof appealed from," we are obligated to apply a liberal construction to that requirement. "Our task is to interpret the notice of appeal so as to remain faithful to the intent of the appellant, fair to the appellee, and consistent with the jurisdictional authority of this court." *Conway v. Village of Mount Kisco,* 750 F.2d 205, 211 (2d Cir.1984).

In the instant case, the Economous' notice of appeal reflected their intent to challenge the district court's freeze on their assets, whether the freeze be accomplished through a temporary restraining order or preliminary injunction. In addition, interpretation of the Economous' notice of appeal to comprehend Judge Kram's order of November 6 visits no unfairness upon the SEC, which has shown itself prepared to defend the preliminary injunction. Accordingly, we address the merits.

that "over the course of 17 years, Arthur Economou borrowed a total of approximately $500,000 from the ABT complex." Appellants' Br. at 44. The Economous have offered no documentary evidence to support their claim that these debts are offset by management fees owed them by ABT entities. Given the doubt cast on the credibility of the Economous by these proceedings, Judge Kram was clearly correct in issuing the injunction.

Moreover, there was a clear danger that the Economous would have depleted their assets substantially in the absence of a freeze. Although Mr. Economou's invocation of his constitutional privilege against self-incrimination has prevented the district court and the Special Master from obtaining detailed information about the Economous' personal finances, Mrs. Economou nevertheless admitted in an affidavit dated October 28, 1986 that the Economous' income was insufficient to meet their living expenses. Given these facts and "the fraudulent nature of appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money." *Manor Nursing Centers,* 458 F.2d at 1106.

## III

Arthur Economou also appeals from the district court's order holding him in both civil and criminal contempt for (1) redeeming notes in violation of the court's order of May 30, and (2) expending assets of the notes program in violation of the court's orders of August 8 and August 15. We first address the criminal contempt convictions.

With regard to the redemptions, Mr. Economou contends that the order of May 30 failed to state clearly whether or not it applied to the redemption of notes for which redemption orders had been received but not executed when the injunction went into effect. Alternatively, Mr. Economou contends that his wife Phyllis Economou, and not he, bore responsibility for the redemptions.

When a district court's order has been violated, the court may impose either civil contempt remedies or criminal contempt sanctions, or both. But "because the 'judicial contempt power is a potent weapon[,]' ... an order of contempt cannot issue unless the order claimed to be violated is specific and definite." *UFI Razor Blades, Inc. v. District 65, Wholesale, Retail, Office and Processing Union,* 610 F.2d 1018, 1024 (2d Cir.1979) (quoting *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed. 2d 236 (1967)). Criminal contempt sanctions may only be imposed if it is proven beyond a reasonable doubt that the contemnor willfully violated the terms of a court order. *See, e.g., In re Weiss,* 703 F.2d 653, 662 (2d Cir.1983).

Contrary to Mr. Economou's assertions, the district court's order of May 30, 1986 was sufficiently precise in its terms to support a contempt conviction. The pertinent part of this order stated:

> the Court orders the defendants to *cease the redemption of maturing commercial paper immediately.* The Court finds that such an order is necessary to preserve the defendants' assets and to allow the Court to develop the most equitable wind-down proposal possible. In the absence of such an order, the Court is convinced that defendants' finances are such that some ABT commercial paper holders will be left with nothing, while others will be able to redeem their paper for full value.

*SEC v. American Bd. of Trade, Inc.,* No. 83 Civ. 6213 (SWK) (S.D.N.Y. May 30, 1986) (order lifting stay of preliminary injunction and enjoining redemption of commercial paper) (emphasis added). Judge Kram's order was thus unequivocal and unqualified in requiring defendants to cease redemptions *"immediately."* And as we stated in our order of July 18, 1986, "the district court's order enjoin[ed] *all* redemptions." *SEC v. American Bd. of Trade, Inc.,* No. 86–6100 (2d Cir. July 18, 1986) (order lifting stay pending appeal of injunction against redemptions and sales of unregistered notes) (emphasis added).

The district court also properly rejected the Economous' contention that Arthur Economou did not bear responsibility for the prohibited redemptions. Three weeks before the contempt hearing, Mr. Economou admitted responsibility for the redemptions. *ABT III,* 645 F.Supp. at 1052; *In re Economou,* 645 F.Supp. at 1058 (S.D.N.Y.1986). Moreover, ... at the contempt proceeding itself, both Economous testified that Mr. Economou had expressly approved the redemptions, and other evidence demonstrated that the redemptions could not have occurred without his approval.

It is true that Mrs. Economou testified at the contempt proceedings that the decision to redeem notes after July 18 "was entirely [hers]." The district court, however, discredited Mrs. Economou's testimony, concluding that "her demeanor and evasiveness while testifying about Mr. Economou's role in the redemptions indicate that she was attempting to protect her husband." *In re Economou,* 645 F.Supp. at 1058. Because Judge Kram saw and heard Mrs. Economou's testimony, the burden on Mr. Economou "of showing that [the district court's] findings are clearly erroneous is a heavy one." *United States v. Charmer Indus., Inc.,* 722 F.2d 1073, 1079 (2d Cir.1983). In light of the substantial evidence pointing to Mr. Economou's responsibility for the redemptions, this burden has not been met.

More difficult, however, is the question of whether the district court properly found Mr. Economou guilty of criminal contempt for having violated the court's orders of August 8 and August 15, 1986, which prohibited defendants from expending assets of their commercial paper program. Mr. Economou asserts that the court's order of August 15 (and presumably also that of August 8) only "*appears* to be 'definite, clear, specific, and [to have] left no doubt or uncertainty in the minds of those to whom it was addressed.'" Appellants' Br. at 42 (quoting *Richmond Black Police Officers Ass'n v. City of Richmond,* 548 F.2d 123, 129 (4th Cir.1977)). We assume that by this statement Mr. Economou contends that the references in the court's orders to "assets, funds and other property of defendants' unregistered notes program," *ABT III,* 645 F.Supp. at 1051, failed to specify adequately which assets or funds should not be spent. In addition, Mr. Economou argues that the expenditures that he made in connection with the preparation of Bulletin No. 2 were not in fact assets of the commercial paper program.

The district court's temporary restraining order of August 8, 1986 prevented the defendants from dissipating any assets from their commercial paper program for ten days. On August 15, the court issued a preliminary injunction ordering that:

> pending further order of this Court, all assets, funds and other property of defendants' unregistered notes program are temporarily frozen and defendants ... be and hereby are preliminarily enjoined from dissipating, liquidating, assigning, transferring, encumbering or otherwise disposing of any funds, assets or other property, of their unregistered notes program ...

*Id.* Mr. Economou contends that "by no stretch of the imagination was the postage in the New Hampshire meter provably an asset of the ABT commercial paper program." Appellants' Br. at 43.

We disagree. Mr. Economou does not dispute that in mailing Bulletin No. 2 he used a postage meter located at ABT's office in Concord, New Hampshire, and his affidavit of August 13, 1986 demonstrates that ABT Service made the resultant postage payments to Concord's postmaster. Because the notes program involved paper issued by ABT Service and because proceeds from their sale constituted the great bulk of ABT's liquid assets, the district court reasonably concluded that Mr. Economou used assets of the notes program in drawing upon an ABT Service account. In view of Mr. Economou's dominant role in the ABT complex, he had to know the account in question contained assets from the notes program. We therefore affirm Mr. Economou's conviction for a second count of criminal contempt.

■ We next turn to the civil contempt findings. Ordinarily, these findings would not warrant further discussion, for generally once the higher standard of proof for criminal contempt has been met, a court may also impose civil contempt sanctions. Whereas criminal contempt requires proof beyond a reasonable doubt, civil contempt requires only proof by clear and convincing evidence, *see, e.g., In re Weiss,* 703 F.2d at 662, and does not require proof of willfulness. *See, e.g., EEOC v. Local 638,* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd sub nom. Local 28, Sheet Metal Workers Int'l Ass'n v. EEOC,* — U.S. —, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986). The civil contempt findings in this case, however, are apparently unique, in that Judge Kram imposed civil contempt sanctions against Mr. Economou *sua sponte.* Indeed, although the SEC defends the civil contempt judgment as correct, it also admits that it might never have requested such sanctions. We have previously expressed doubt that a district court may impose civil contempt sanctions *sua sponte. United States v. Russotti,* 746 F.2d 945, 949 (2d Cir.1984). And "we have found no case permitting such a practice in the course of either civil or criminal litigation." *Id.* Of course, the danger in allowing district courts to initiate civil contempt proceedings is that civil contempt sanctions may be used solely to evade the procedural constraints that attend criminal contempt proceedings.[3] *MacNeil v. United States,* 236 F.2d 149, 154–55 (1st Cir.), *cert. denied,* 352 U.S. 912, 77 S.Ct. 150, 1 L.Ed.2d 119 (1956).

■ Although the danger of evasion of procedural protection surrounding those subject to contempt proceedings is a real one, we believe that the circumstances of this case justify *sua sponte* resort to the civil contempt remedy. The injunction violated by Mr. Economou was designed to protect persons who were not parties to the action and were too numerous and too ill-informed to protect their own interests. Realistically speaking, responsibility for the operation of the ABT complex and for protecting noteholders was divided between: (1) the SEC, an agency with limited resources that hoped to delegate its responsibilities to a special master; (2) the special master, who was at the time preoccupied with the task of determining the state of affairs of the ABT complex without cooperation from Mr. Economou; and (3) the district court. In such circumstances, we believe the district court had the obligation and resultant power to protect ABT's noteholders, the principal beneficiaries of the underlying proceeding, whether or not the SEC specifically requested such relief. Although this was not a class action, we believe the district court's obligation to protect the noteholders by compelling restitution was analogous to the obligations it has in reviewing settlements of a class action and distributions to the class. In the latter circumstances, the court's obligations to protect the class are quite independent of the initiative or wishes of class representatives, named plaintiffs, or class members who appear at the relevant hearing. *See In re "Agent Orange" Prod. Liab. Litig. MDL No. 381,* 818 F.2d 179, 182 (2d Cir. 1987). We believe a similar obligation, independent of the actions of the plaintiff SEC, existed here.

We consider it critical to our upholding this exercise of power that the court carefully tailored the sanction it imposed to the restitution of assets in order to restore

3. In vacating a civil contempt finding, the *MacNeil* court stated that

> It is clear that in a criminal contempt proceeding both a fine and imprisonment may not be imposed for a single act of contempt.... It is equally clear that both may be imposed where the same act constitutes civil and criminal contempt. So long as civil contempts are restricted to those initiated by the parties primarily in interest we see nothing objectionable in the double sentence—one remedial, the other punitive. We believe, however, that such a double sentence is not proper where the parties primarily in interest have not complained and where the trial judge, in effect, seeks to turn the remedial sentence for civil contempt into additional punishment for an offense to the public interest. If the court may accomplish this by merely adding the word "civil" to his charge of criminal contempt then the provisions of [18 U.S.C.] § 401 [governing criminal contempts] become meaningless.

236 F.2d at 154–55.

ABT's noteholders to the position they would have been in if the injunction had been obeyed. The remedy was thus not punitive, and was limited to the protection of non-party beneficiaries of the proceeding. Finally, we note that the SEC now endorses the resort to civil contempt as necessary to protect ABT's noteholders. We therefore affirm the district court's findings of civil contempt.

## IV

The Economous next contend that the district court violated their first amendment rights when it issued an order prohibiting them from communicating with the noteholders without prior approval of the court. In response, the Special Master and Receiver argues that the Economous' Bulletins were "commercial speech" and that the restrictions imposed upon the Economous constituted a proper regulation of such speech.

Commercial expression is protected by the first amendment, because "the free flow of commercial information ... is indispensible to the proper allocation of resources in a free enterprise system [and] to the formation of intelligent opinions as to how that system ought to be regulated or altered." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976). Nevertheless, the Constitution recognizes "the 'common-sense' distinction" between commercial speech and other forms of speech, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978), and "therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed. 2d 341 (1980). Moreover, "commercial speech receives [this] limited form of First Amendment protection so long as it concerns a lawful activity and is not misleading or fraudulent." *Posadas de Puerto Rico Assocs. v. Tourism Co.*, — U.S. —, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986).

The Economous' Bulletins were unquestionably misleading. They made wholly unsubstantiated assertions about the motives of the SEC, and the circumstances leading to their inability to register ABT notes. Moreover, they brazenly claimed sound financial health for the grossly insolvent ABT entities and went on to describe the Economous' plans to register their proposed public offerings as though that was a realistic alternative. As misleading commercial speech, the Bulletins are not entitled to first amendment protections and may, like "[m]isleading advertising[,] ... be prohibited entirely." *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982); *see also FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C.Cir.1985).

We note, moreover, that the communications at issue are entitled to less constitutional protection than is commercial speech generally. These communications were specifically addressed to the creditors of a company in a receivership imposed by a United States district court. The communications specifically concerned the administration of that receivership. Under such circumstances, the public's interest in the free flow of information to benefit consumers and voters is minimal, whereas the district court has an obligation to minimize costs of administration and to ensure that creditors are fully and accurately informed of the company's true state of affairs. When Judge Kram learned that grossly misleading statements had been sent to the creditors who thereafter inundated the special master with inquiries resulting from their understandable confusion as to ABT's condition, she was well within her authority in ordering that such communications be sent in the future only with her approval.

The restrictions imposed by the district court were not broader than necessary to achieve their legitimate goals. The district court adopted a narrowly tailored screening mechanism through which the Economous may submit proposed communications for approval by the court and subsequent distribution to noteholders. There has been no showing that the court has in any way impaired the Economous' ability to

communicate with the noteholders in ways that are not misleading or deceptive. Moreover, the injunction does not restrict the Economous' ability to issue "direct comments on public issues," *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 68, 103 S.Ct. 2875, 2881, 77 L.Ed.2d 469 (1983), through any means that do not address the noteholders as the principal audience. The prescreening mechanism employed by the district court was thus reasonably tailored to its legitimate goals. *See Central Hudson Gas*, 447 U.S. at 571 n. 13, 100 S.Ct. at 2354 n. 13 ("The [respondent] Commission also might consider a system of previewing advertising campaigns to insure that they will not defeat conservation policy."); *Brown & Williamson*, 778 F.2d at 43–44 (upholding injunction prohibiting tobacco company, absent FTC approval, from advertising cigarettes as having certain tar ratings).

V

Finally, we address briefly two procedural matters raised in these appeals. The first involves two motions filed by Mr. Economou on October 22 and October 27, 1986, by which he sought leave to intervene as a plaintiff as of right under Fed.R.Civ.P. 24(a)(1), (a)(2) and 24(c). The proposed complaint accompanying the first motion is brought in Mr. Economou's name but alleges only that ANE & Co., a corporation, has accumulated $1 million in credits with ABT for alleged commissions and management fees. The other proposed complaint was styled a "membership action" on behalf of Mr. Economou and ABT, and can best be characterized as a generalized attack upon Mr. Gould's conduct of the receivership. The district court denied Mr. Economou's motions to intervene on November 3 and December 17, 1986, respectively.

The district court did not err when it denied these motions. Both are frivolous on their face, and the court was not required to grant leave to intervene to file a clearly meritless complaint. *Cf. Keith v. Daley*, 764 F.2d 1265, 1268 (7th Cir.1985) (interest of proposed intervenor of right must be "so direct that the applicant would have 'a right to maintain a claim for the relief sought' ") (citation omitted).

The second procedural issue concerns the defendants' motion, filed on May 26, 1986, for leave to amend their answer and to assert a counterclaim and various affirmative defenses. Defendants appeal from the district court's denial of this motion. An order denying a motion to amend a pleading, however, is not appealable as a "final decision" under 28 U.S.C. § 1291 (1982). *Richardson Greenshields Sec., Inc. v. Mui-Hin Lau*, 825 F.2d 647, 650 (2d Cir.1987); *D'Ippolito v. Cities Serv. Co.*, 374 F.2d 643, 648 (2d Cir.1967). Moreover, the "collateral order" exception to the final judgment rule does not apply under these circumstances. *Richardson*, at 650–51. Nor is the denial of amendment so related to the rulings properly appealed as to warrant the exercise of pendent appellate jurisdiction. *Cf. San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 255 (2d Cir.1984). Accordingly, we must dismiss defendants' appeal of the district court's denial of their motion to amend their answer. In addition, although a district court may deny leave to amend only in unusual circumstances, we do not consider this case to be an appropriate occasion for the treatment of defendants' attempted appeal as a request for leave to file a petition for a writ of mandamus. *Richardson*, at 651. As the SEC points out, the defendants' proposed amendments to their answer raise issues that have already been decided by this Court; defendants, for example, seek to raise the defense that the ABT notes program is exempt from registration—an argument that we expressly rejected in *ABT I*. *See* 751 F.2d at 538–40.

CONCLUSION

We have considered appellants' remaining contentions and have found them to be without merit. Accordingly, the orders of the district court appealed herein are affirmed, except for the order denying defendants' motion to amend their answer. The appeal of that order is dismissed.

It is so ordered.