**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**The AMERICAN BOARD OF TRADE, INC., Arthur R. Economou, Phyllis H. Economou, and the American Board of Trade Service Corp., Defendants.**

**No. 83 Civ. 6213 (SWK).**

United States District Court, S.D. New York.

Aug. 15, 1986.

On Motion for Appointment of Receiver Sept. 2, 1986.

---

Securities and Exchange Commission by Ira Lee Sorkin, Charles A. Padgett, Caryn A. Miller, Nanette A. King, New York City, for plaintiff.

Comer & Meyerson by Neal S. Comer, New York City, for corporate defendants and Phyllis H. Economou.

Arthur Economou, pro se.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

By order to show cause dated August 7, 1986, the Securities and Exchange Commission ("SEC") sought an order to freeze the funds and other assets of the defendants' unregistered commercial paper program. The order to show cause was returnable on August 8, and the Court heard oral argument on that date. At the conclusion of the argument, the Court issued a temporary restraining order ("TRO") barring the defendants from dissipating any assets from their commercial paper program for a period of ten days. *SEC v. ABT,* No. 83 Civ. 6213 (SWK), slip op. (S.D.N.Y. August 8, 1986). The Court also set a briefing schedule on the SEC's application for an order freezing the assets.[1]

The Court set a tight briefing schedule on the motion to freeze the assets because of the seriousness of the issue and because the defendants had notice, at least since a pre-trial conference held on July 28, 1986, that the SEC would be making this application. Moreover, at a pre-trial conference held on May 30, 1986, the defendants were orally ordered by the Court not to transfer or dissipate assets. Thus, the defendants have had ample time to formulate a response to the SEC's application, and they cannot legitimately complain of any unfair surprise by, or lack of notice of, this application.

Currently before the Court is the SEC's application to freeze the funds and assets of the defendants' unregistered commercial paper program. The freeze order would last until the Special Master issues his report and the Court formulates and implements a wind-down program. The SEC's application must be considered in the context of the current posture of this case. On July 25, 1985, this Court entered a preliminary injunction against the corporate defendants ("ABT"). That injunction prevented ABT from issuing unregistered commercial paper. That injunction was stayed by its own terms for an extended period of time. After the defendants failed to register their commercial paper program the Court, in an order dated May 30, 1986, lifted the stay of that injunction. The May 30 order also precluded the defendants from redeeming maturing commercial paper. The defendants appealed this Court's injunction, and this Court was affirmed on August 8, 1986. *See SEC v. ABT,* 798 F.2d

---

1. At oral argument, counsel for the defendants indicated that an evidentiary hearing was unnecessary and that the Court could consider the motion on submission of papers. The SEC concurred in this view.

45 (2d Cir.1986). Thus, there is no longer any doubt as to the appropriateness of this Court's injunction and of the unlawfulness of defendants' commercial paper program.

On July 31, 1986, the Court appointed a Special Master to complete a full accounting of the financial condition of the ABT entities, and to assist in implementing a wind-down of the defendants' commercial paper program. The appointment of a Special Master was necessitated by the defendants' unwillingness and inability to present the Court and the SEC with an accurate picture of their financial condition. The Special Master is to present his report to the Court by October 1, 1986. It is against this background, and based on the entire record in this case, that the SEC now seeks to freeze the funds and assets of the defendants' commercial paper program; a program which is currently subject to a preliminary injunction.

The SEC's position is easily summarized. It contends that as of May 19, 1986, the last date for which financial information has been produced, the defendants had $83.2 million in outstanding commercial paper and only $23.1 million in liquid assets to apply towards this liability. Thus, the defendants are grossly insolvent. Moreover, the defendants' can no longer raise money through the sale of commercial paper. In view of this, it is imperative to preserve the assets of the commercial paper program to prevent irreparable harm to the commercial paper holders, who number approximately 9,100, according to the SEC.

The SEC further contends that the defendants have depleted the available assets through expenditures on advertisements for the sale of ABT and bulletins distributed to the noteholders. The SEC does not object to the existence and distribution of the advertisements and bulletins. Rather, it simply objects to any expenditure which depletes the assets of the commercial paper program; assets which appropriately belong to the 9,100 commercial paper holders. The SEC also submits, presumably as evidence of the defendants' intentions to further deplete assets, that on June 2, 1986 the defendants raised the discount rates on their commercial paper to 10%. Thus, the SEC simply wants to prevent any further dissipation of the commercial paper program's assets. Its concern, and the Court's concern, is heightened by the defendants' apparent gross insolvency. The SEC is not seeking to freeze all of the defendants' assets; only the assets of the commercial paper program are to be frozen. Moreover, the SEC is not seeking to close the defendants' business or to have a receiver appointed.

The defendants' response to the SEC's contentions are unresponsive and contradictory. At oral argument on the SEC's TRO application the defendants contended that the SEC's moving papers were untrue and an attempt to mislead the Court. This contention is frivolous, unsupported, unresponsive and dismissed out of hand. The defendants alternatively argued that a freeze order was inappropriate in view of their pending appeal before the Second Circuit Court of Appeals. On August 8, however, the Second Circuit issued its opinion affirming this Court's injunction. That opinion was issued subsequent to oral argument. Thus, this contention is no longer meritorious.

In their reply papers to the SEC's application, which consists solely of a four page affidavit of Arthur Economou, the defendants apparently no longer object to an order freezing the assets of the unregistered commercial paper program. Rather, they ask that assets which are not a part of the commercial paper program not be frozen. Neither the Court nor the SEC has a problem with this proposition in general at this point in time.

It is apparently undisputed by the defendants that the Court has the authority to enter an appropriate freeze order such as the one sought by the SEC in its application. The defendants' consent notwithstanding, it is indisputable that the Court, as part of its equity jurisdiction, can enter such an order. *See SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1103–1106

(2d Cir.1972). The Second Circuit has explained:

> Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy.

*Id.* at 1103. In the instant case, the Court has already determined that the defendants violated the federal securities laws by issuing unregistered commercial paper, and has enjoined them from continuing this practice. The very serious question remains, however, how to protect and compensate the 9,100 holders of the defendants' commercial paper. It is that question which the Court now must address.

" ... [T]he decision to order a temporary freeze on defendants' assets as ancillary relief in an SEC enforcement action requires particularly careful consideration by the district court." *Manor Nursing Centers, Inc.*, at 1105. The Second Circuit has stated:

> ... [T]here may be circumstances where a district court should temporarily freeze defendants' assets to insure that they will be available to compensate public investors. Freezing assets under certain circumstances, however, might thwart the goal of compensating investors if the freeze were to cause such disruptionof defendants' business affairs that they would be financially destroyed. Thus, the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such releif.

*Id.* at 1106.

In the instant case, the problem of compensation to public investors is significant. The full gravity of the situation at this point is impossible to determine largely because of the defendants' total failure to maintain, and produce to the Court, accurate financial records. This failure was so great as to necessitate the appointment of a Special Master to construct this information for the SEC and the Court.

Accepting the defendants' own prior statements as true for purposes of this motion—statements which are now over two months old in any event—there is in excess of $80 million in commercial paper held by approximately 9,100 public investors and less than $24 million in liquid assets to satisfy these liabilities. Moreover, the defendants have not even suggested, let alone demonstrated, that their gross insolvency has significantly improved in the past two months.[2]

The freeze order sought by the SEC would apply solely to funds and assets of the enjoined commercial paper program. Moreover, since that program is now entirely frozen there should be no legitimate expenses incurred as ancillary to the operation of that program.[3] The freeze order is also for a limited duration. The assets would remain frozen only until the Special Master's report is completed and a wind-down program approved and implemented. Indeed, the assets to be frozen are those to be utilized as part of the wind-down program and rightfully belong to the 9,100 noteholders in any event.

The Court is aware that a freeze order may cause some disruption to the business affairs of the defendants. The narrowly tailored freeze order outlined above, however, should minimize the disruption. Any disruption which occurs despite the properly tailored order is occasioned by the defendants' conduct and by their failure to thus far produce an accurate, comprehensive financial picture of their business operations and of the commercial paper program in particular. Thus, it is the defend-

---

**2.** At oral argument the defendants contended that they had recently earned $38,500 in one day from various trades of financial instruments. This is but a mere drop in the bucket compared with defendants' apparent drastic deficit in the commercial paper program. Moreover, Economou's affidavit of compliance dated August 13, 1986 evidences a significant deple-

tion of assets for July and August, 1986. It appears that over $5 million in funds have been expended during this period.

**3.** At oral argument the defendants conceded that they were incurring no expenses for the frozen commercial paper program.

ants, and not the public investors, who should bear the consequences of any disruption. The need to freeze assets is greatly heightened by Economou's affidavit of compliance dated August 13, 1986. This affidavit outlines a significant depletion of funds, to the tune of over $5 million in only the past six weeks.

At oral argument, and in an opposing affidavit, Arthur Economou argued that in excess of $1.2 million frozen by this Court's August 8 TRO are customers' funds from the defendants' trading programs. This contention is not only unsupported; it is contradicted by Economou's earlier statements to the Court. Annexed to the affidavit of Arthur Economou dated May 20, 1986, was exhibit B. This was submitted at the Court's request and apparently prepared at Economou's request. Exhibit B is entitled "ABT Service Corp. Commercial Paper Program Cash Inflow/Outflow From Oct. 4, 1985." The exhibit outlines the liquid assets derived from and attributable to the defendants' unlawful commercial paper program. It was clearly presented to the Court as such when it was first submitted to the Court. At oral argument the defendants' argued for the first time, in stark contrast to and in direct contradiction of their earlier submissions, that some portion of the "exhibit B" funds are not attributable to the commercial paper program. In Economou's affidavit of August 12, 1986, he argues that in excess of $1.2 million in customers' trading funds were erroneously included in exhibit B of his earlier affidavit. Defendants' position is neither credible nor supported by a shred of evidence. The Court thus rejects this contention at this time. The defendants can attempt to support their contentions with adequate, credible, documentary evidence. If they do, the court will reconsider its position.

█ In view of the foregoing, the Court concludes that the carefully tailored freeze order sought by the SEC should be granted. Accordingly, it is hereby:

ORDERED that, pending further order of this Court, all assets, funds and other property of defendants' unregistered notes program are temporarily frozen and defendants, their agents, officers, employees, servants, and attorneys, and those persons in active concert or participation with them, and each of them, be and hereby are preliminarily enjoined from dissipating, liquidating, assigning, transferring, encumbering or otherwise disposing of any funds, assets or other property, of their unregistered notes program, including but not limited to all of the assets delineated in exhibit B annexed to the affidavit of Arthur Economou dated May 20, 1986.

This order shall remain in place until the Special Master's Report is completed and the Court has approved and implemented a wind-down program. This order applies with equal vigor to any assets, funds or property previously acquired, in whole or in part, by the defendants with funds from the sale of commercial paper.

SO ORDERED.

## ON MOTION FOR APPOINTMENT OF RECEIVER

On August 15, 1986, this Court entered an order temporarily freezing all assets, funds, and other property of defendants' (collectively referred to as "ABT") unregistered notes program and preliminarily enjoining defendants from dissipating, liquidating, encumbering or otherwise disposing of any funds, assets, or other property of their unregistered notes program. *Securities and Exchange Commission v. American Board of Trade*, No. 83 Civ. 6213 (SWK), slip op. at 9 (S.D.N.Y. August 15, 1986).

In its opinion, the Court found that as of May 19, 1986, the last date for which ABT financial information had been produced, approximately 9,100 public investors held in excess of $80 million of defendants' commercial paper and that defendants held less than $24 million in liquid assets. The Court also found that defendants' assets had been depleted by $5 million in the six weeks prior to the opinion. The Court ruled that in light of the preliminary injunc-

tion prohibiting ABT from issuing or redeeming commercial paper and the impending wind-down of defendants' commercial paper program, the freeze order was necessary to preserve the assets of the commercial paper program which belong to the paper holders.

This case is currently before the Court on the Securities and Exchange Commission's ("SEC") motion for an order appointing a receiver to approve, in advance and in writing, all expenditures and disbursements of defendants and enjoining the commercial program from incurring or paying any expenses without having obtained the prior approval of such receiver. After hearing oral argument on this motion on August 15, 1986, the Court ordered that the Special Master in this case approve of all defendants' disbursements pending the Court's decision.[1]

■ "The appointment of a receiver is an extraordinary remedy to be invoked only in cases of necessity and upon a clear showing that an emergency exists." *Petersen v. Federated Development Co.*, 387 F.Supp. 355, 361 (S.D.N.Y.1974). A federal district court has the equity power to appoint a receiver when necessary "to prevent diversion or waste of assets to the detriment of those for whose benefit, in some measure, this injunctive action is brought." *Securities and Exchange Commission v. H.S. Simmons and Co.*, 190 F.Supp. 432–433 (S.D.N.Y.1961). Although the Court has frozen all of defendants' assets, and has required the Special Master to approve all expenditures, it is clear for a number of reasons that the freeze will not prevent the continued diversion and waste of defendants' assets. A receiver is thus necessary to prevent further depletion of paper holders' assets.

First, defendant Arthur N. Economou admitted to the Court on August 15, 1986 that he redeemed the commercial paper of over 100 commercial paper holders after July 18, 1986, the date the Second Circuit lifted its stay on this Court's order prohibiting redemption and issuance of commercial paper. He did so willfully, with full knowledge the Second Circuit had lifted the stay. Furthermore, on August 19, 1986, ABT mailed an eight page "Bulletin" about this case to all commercial paper holders. Affidavit of Caryn Miller, sworn to on August 25, 1986, Exhibit A. Defendants apparently did not seek authorization for this expenditure from the Special Master or the Court. Based on these willful and knowing violations of court orders, it is clear that only direct supervision will prevent defendants from diverting ABT assets.

Second, Economou's court-ordered disclosure of all ABT disbursements and expenditures since June 1, 1986, raises many problems. *See* Affidavits of Arthur N. Economou, sworn to on August 13, 1986, and August 22, 1986, and attached exhibits. While the exhibits list when and to whom the disbursements were made, they do not describe the reason they were made. When pressed by the Special Master at a conference on August 14, 1986 to explain the expenditures, Economou was evasive and did not sufficiently do so. Thus, over $5 million in expenditures in six weeks is unexplained.

Economou also admitted to the Special Master at the conference that he and his wife have "borrowed" money from ABT each year to pay their taxes. These loans have totalled approximately $500,000 over 17 years, and are still outstanding.

Finally, the financial disclosures indicate numerous and significant cash transfers from defendants' commercial paper operations to other ABT entities, raising the possibility that ABT commercial paper assets are being used to operate other ABT entities. For example, between July 28 and August 4, 1986, $15,500 was transferred from ABT Service, Inc., a commercial paper entity, to Arthur N. Economou &

---

**1.** On August 28, 1986, during the pendency of this motion, the SEC filed a motion seeking the appointment of a receiver for all ABT entities. The Court heard argument on that motion on September 2, 1986, and this opinion includes the Court's decision on the August 28, 1986 motion.

Co., Inc. ("ANE"), another ABT entity, apparently not involved in commercial paper. ANE's expenses between July 28 and August 11, 1986 were approximately $17,000. When the Special Master asked Economou to explain the relationship among the various ABT entities and to explain how and why money is transferred among them, he did not do so adequately.

Third, the Court is concerned with Economou's intransigence, unwillingness to adhere to the Court's freeze order, and failure to cooperate with the Special Master's attempts to authorize expenditures.[2] Economou threatened to walk out of the August 14, 1986 conference before the Special Master after the Master informed him he would seek to prevent Economou from sending obstructive and inaccurate bulletins about this case to paper holders. Instead, as described above, Economou mailed the Bulletin to shareholders on August 19, 1986, without authorization from the Master. While the Court expects Economou to present a defense in this case, it is concerned that paper holders' assets not be diverted to unnecessary and inaccurate bulletins and advertisements. Finally, Economou has failed to cooperate with the Special Master's efforts to authorize ABT disbursements.

Based on the Court's findings in its August 8, 1986 opinion, particularly that nearly $5 million in ABT assets had been expended between July 1 and August 11, 1986, and the Court's findings in this opinion that ABT willfully and knowingly redeemed paper despite this Court's order prohibiting it from doing so, that ABT expended assets on a bulletin despite the freeze order and without the required authorization from the Master, the probability that commercial paper assets are being used to fund other ABT entities' operating expenses, the confusion created by defendants' own recordkeeping and accounting methods, and defendant Economou's own behavior in this case and in failing to repay loans from ABT, the Court rules that an expansion of the freeze order and the appointment of a receiver are necessary to prevent the further diversion of commercial paper assets. Accordingly, it is hereby

ORDERED that pending further order of this Court, all assets, funds and other property of all ABT entities listed in Appendix A to this opinion are temporarily frozen and defendants, their agents, officers, employees, servants, and attorneys and those persons in active concert or participation with them, and each of them, be and hereby are preliminarily enjoined from dissipating, liquidating, assigning, transferring, encumbering or otherwise disposing of any funds, assets or other property, of all ABT entities, including but not limited to all of the assets delineated in Exhibit B annexed to the affidavit of Arthur Economou dated May 20, 1986; and it is further

ORDERED that until he files his report, Special Master Milton Gould is appointed interim receiver of all ABT entities as listed in Appendix A. The interim receiver shall have full powers of an equity receiver, including, but not limited to, all powers set forth in the July 31, 1986 Order of this Court appointing Milton S. Gould, Esq. as Special Master, and full powers over all funds, assets, premises (whether owned, leased, occupied or otherwise controlled), choses in action and other property belonging to or in the possession or control of defendants or any of their affiliates listed in Appendix A to this opinion, or any property, assets or funds over which defendants or any of their affiliates listed on Appendix A have a power of attorney or the authority to deposit or withdraw funds; and it is further

ORDERED that defendants, their affiliates listed in Appendix A, their respective officers, agents, servants, employees, attorneys and those persons in active participation with them, to cooperate fully with the interim receiver; and it is further

---

2. The Court has reviewed and read transcripts of conferences held before the Special Master on August 14, 1986, August 19, 1986, and August 25, 1986.

ORDERED that defendants, their affiliates listed in Appendix A, their respective officers, agents, servants, employees, attorneys and those persons in active participation with them, turn over to the interim receiver all of the assets, books, records and other property of said defendants and affiliates. Furthermore, Arthur Economou, Phyllis Economou, and Benjamin Bayoneto are to submit an affidavit to the Court by September 8, 1986 listing the assets and liabilities of all ABT entities, in whatever form and wherever they are located; and it is further

ORDERED that the parties are to submit to this Court proposed orders appointing the Receiver, and appropriate briefing in support of the proposals, by 5:00 p.m. on September 8, 1986.

SO ORDERED.

## APPENDIX A

The American Board of Trade, Inc.

The American Board of Trade Service Corp.

The American Board of Trade Clearing Corp.

The American Board of Trade Development Corp.

The American Board of Trade Dealer Specialist Corp.

The American Board of Trade National Market System, Inc.

The Journal of Investment Finance, Inc.

Arthur N. Economou & Co., Inc.

Economou Financial and Development Corp.

The American Board of Trade—New Hampshire, Inc.

The American Board of Trade—Merrimack Valley North, Inc.

The American Board of Trade—Merrimack Valley Central, Inc.

The American Board of Trade—Merrimack Valley South, Inc.

The American Board of Trade—Wisconsin, Inc.

The American Board of Trade—Dane County, Inc.

The American Board of Trade—New Jersey, Inc.

The American Board of Trade—Bergen County, Inc.

The American Board of Trade—Virginia, Inc.

The American Board of Trade—Dranesville District, Inc.

The American Board of Trade—California, Inc.

The American Board of Trade—Pennsylvania, Inc.

The American Board of Trade Research Institute, Inc.

The American Board of Trade Government Fund, Inc.

The New Hampshire Intra-State "Micro" Money Market Fund, Inc.

The American Board of Trade New England, Inc.

The American Board of Trade Northeast Atlantic, Inc.

The American Board of Trade Appalachian Region, Inc.

The American Board of Trade Southeast, Inc.

The American Board of Trade Midwest-Great Lakes, Inc.

The American Board of Trade Southern Great Plains, Inc.

The American Board of Trade Northern Great Plains, Inc.

The American Board of Trade Rocky Mountain Region, Inc.

The American Board of Trade Pacific Coast, Inc.