**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**AMERICAN BOARD OF TRADE, et al., Defendants.**

No. 83 CIV. 6213 (SWK).

United States District Court,
S.D. New York.

Aug. 2, 1989.

No appearance for plaintiff.

Shea & Gould, New York City by Milton S. Gould, Peter Neger, and Eric P. Wainer, for receiver.

Arthur N. Economou, New York City, pro se.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action is presently before the Court on the motions of Special Master and Receiver Milton S. Gould, who moves (1) to disallow, reduce or subordinate certain customer and creditor claims, and (2) to disallow or subordinate claims made by defendants Mr. and Mrs. Arthur N. Economou on behalf of themselves and corporations they own. At a hearing on these motions, the Court received the testimony of two witnesses called by the Receiver, received exhibits and heard the argument of the Receiver and Mr. Economou, who is acting *pro se* in these proceedings on behalf of defendants.

## BACKGROUND

Though recounted at various points in the past, it is useful to review briefly the history of this litigation. The Securities & Exchange Commission instituted this action in August, 1983, and by amended complaint in September, 1983, sought to enjoin the sale to the public by the American Board of Trade ("ABT") and its subsidiary the American Board of Trade Service, Inc. ("ABT Service") of interests in treasury bills and of commercial paper notes. The treasury bill program offered customers the opportunity to invest in a pool of United States Treasury Bills in exchange for Safekeeping Receipts.[1] The commercial

---

1. A more complete discussion of the treasury bill program is found in the Court of Appeals'

paper program offered investors the opportunity to purchase, at a cash discount, short-term commercial paper in small denominations that matured in either three or six months. The SEC claimed that the sale of treasury bills violated sections 5(a) and (c) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77e(a) and (c), and sections 7(a) and 8 of the Investment Company Act of 1940, 15 U.S.C. § 80a–7(a) and 80a–8. In addition, the SEC claimed violations of sections 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b). The amended complaint named, in addition to ABT and ABT Service, Arthur and Phyllis Economou personally as defendants.

The SEC moved for a preliminary injunction, which the Court granted, finding a strong prima facie case that defendants had violated the federal securities laws in both the treasury bill and commercial paper programs. *SEC v. American Bd. of Trade*, 593 F.Supp. 335, 339, 340 (S.D.N.Y. 1984). The Court specifically found that "the commercial paper offered and sold by ABT is a security within the meaning of section 2(1) of the [1933 Act]." *Id.* at 340. The Court then concluded that the SEC had made out a prima facie case that ABT conducted its commercial paper program in violation of section 5 of the 1933 Act. The Court determined that ABT and the Economous individually were in violation of the Investment Company Act, and also that defendants' failure to disclose certain material information violated the fraud provisions of the securities laws, section 17(a) and section 10(b). The Court issued a broad injunction, enjoining defendants from any violations of the federal securities laws.

On appeal, the Second Circuit reversed and remanded to the Court for the purpose of issuing a narrower injunction, enjoining the issuance, sale or exchange of ABT's commercial paper unless duly registered under section 6 of the 1933 Act, such injunction to be stayed by its own terms for a period of four months. *SEC v. American Bd. of Trade*, 751 F.2d 529, 543 (2d Cir. 1984). The Second Circuit determined that the SEC had not made out a prima facie case of fraud violations under either section 17(a) or section 10(b), in part because the SEC had not argued that defendants misrepresented the nature of what customers were receiving under the commercial paper program. *Id.* at 540–41. The Court of Appeals did not disturb the Court's findings of prima facie violations of the securities laws for failure to register the commercial paper as securities. After concluding that registration of the commercial paper was feasible, the Court of Appeals ordered a four month stay of the injunction to allow for registration or discontinuance of the commercial paper program. The Court of Appeals also advised reconsideration of the necessity of an injunction against the individual defendants and recommended that the injunction be dissolved once defendants had complied.

On remand, this Court enjoined only defendants ABT and ABT Service from violating section 5 of the 1933 Act, staying enforcement until December 2, 1985. The Court found that defendants had made good faith efforts to begin registration of the commercial paper program. *SEC v. American Bd. of Trade*, [1985–86 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,224 (S.D.N.Y. July 26, 1985) (1985 WL 2615). Subsequent orders extended the stay. In March, 1986, the Court concluded that the registration of the commercial paper program had become "impracticable", as the Second Circuit had used the term, and ordered the parties to begin formulating a plan to wind-down the program. *SEC v. American Bd. of Trade*, [1985–86 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,546 (S.D.N.Y. March 19, 1986) (1986 WL 3511). At the same time, the Court extended the stay of the injunction through May 28, 1986 and certified the question for appeal pursuant to 28 U.S.C. § 1292(b).

opinion reviewing the Court's issuance of a preliminary injunction. *SEC v. American Bd. of Trade*, 751 F.2d 529, 531 (2d Cir.1984). Since the treasury bill program is not at issue here, the Court will not describe it further.

In a subsequent order, dated May 30, 1986, the Court appointed Edward Brodsky, Esq. as special master to supervise the winding up of the commercial paper program and ordered that the stay of the injunction against the sale of commercial paper be lifted and that defendants cease sales or redemptions of notes issued by ABT Service. The Second Circuit, on June 10, 1986, stayed the lifting of the stay pending a decision of the appeals. On June 30, 1986, the government obtained a search warrant from Magistrate Nina Gershon, which enabled the United States Attorney's Office and the United States Postal Service to seize all of ABT Service's records, forcing it to cease doing business. On July 17, 1986, the Court of Appeals at oral argument vacated the stay of the injunction against sales and redemptions. The Court then appointed Gould as special master on July 31, 1986, after relieving Brodsky of the task, to complete a full accounting of the financial condition of the ABT Entities and to assist in implementing a wind-down of the commercial paper program. The Second Circuit affirmed the issuing of the injunction against future sales and redemptions of commercial paper based on defendants' continued failure to provide certified financial records necessary for registration. *SEC v. American Bd. of Trade*, 798 F.2d 45, 47 (2d Cir.1986) (per curiam). At the same time, the Second Circuit affirmed the issuing and execution of the search warrant. *Id.*

The SEC soon thereafter moved to freeze the assets of the ABT Entities. The Court granted the motion to freeze the funds and assets of defendants' unregistered commercial paper program, *SEC v. American Bd. of Trade*, 645 F.Supp. 1047, 1051 (S.D.N.Y. 1986). The Court found that defendants held in excess of $80 million in commercial paper for approximately 9,100 customers, but had less than $24 million in liquid assets to satisfy the liabilities, and that the prospects for reversing the "gross insolvency" of ABT appeared dim. *Id.* at 1050.

The Court shortly thereafter additionally appointed Gould as interim receiver over all the ABT Entities.[2] *Id.* at 1053. The Court concluded that, although it had previously ordered that all expenditures be approved in advance by the special master and had already frozen the defendants' assets, receivership was necessary to avoid further depletion of customers' assets for a number of reasons. *Id.* at 1052. The Court first observed that defendant Economou had violated the Court's injunction, which become operable after the Second Circuit lifted its stay as of July 18, 1986, by redeeming the commercial paper of over 100 paper holders after that date. ABT also mailed a special bulletin to all commercial paper holders without prior approval of the expenditure, and the Court found that these were willful and knowing violations. Second, the Court noted that over $5 million in disbursements since June 1, 1986 through mid-August, 1986 remained unexplained and that the Economous admitted to Gould that they had "borrowed" over $500,000 from ABT to pay their taxes, and had yet to repay any of the "loans". Finally, the Court related that financial disclosures indicated the possibility that commercial paper assets were being depleted to operate other ABT businesses. In particular, the Court cited the unexplained transfer of funds from ABT Service to Arthur N. Economou & Co. Inc. *Id.* at 1053.

After fairly extensive hearings, the Court found Economou guilty of two counts of criminal contempt; the Court also found Economou liable for civil contempt and ordered him to pay out of his own funds close to $200,000 in restitution to ABT Service. *In re Economou*, 645 F.Supp. 1055, 1060 (S.D.N.Y.1986).

In furtherance of his duties as special master, Gould continued the retention of Coopers & Lybrand, which conducted a thorough examination of the assets and liabilities of the ABT Entities. After holding four hearings, Gould filed his report as Special Master and Interim Receiver of the ABT Entities on November 6, 1986 ("Re-

**2.** Appendix A attached to the order lists all the businesses encompassed by the receivership, and it is to these businesses that the term "ABT Entities" refers.

port"). His Report incorporated a report issued in October, 1986 by Coopers & Lybrand, detailing the assets and liabilities of the ABT Entities. The Coopers & Lybrand analysis, upon which the special master drew in his Report, concluded that the ABT Entities had a deficit of some $55,312,445. Report at 20. The Court authorized distribution of the Report to all ABT Entities' and established a mechanism for objections to be filed by early January, 1987. The Court received 200 written objections and over 60 persons attended a public hearing to review the Report held on January 19, 1987. *See SEC v. American Bd. of Trade,* 654 F.Supp. 361 (S.D.N.Y.1987).

The Court reached various conclusions based on the special master's Report and the hearing. The Court found that the "vast amount of ABT's income was derived from its commercial paper program, and this income was used to help establish and pay the expenses not merely of the commercial paper program, but of the entire [ABT] National Market System as well." *Id.* at 364. ABT lost so much money in large part because the cash discount on commercial paper offered to investors was far greater than the return on ABT's investments, which was primarily derived from interest on certificates of deposits. The Court noted that it appeared that the Economou's owed the ABT Entities some $521,900 for interest-free loans they took for themselves. Of the $175,000 ordered in restitution for civil contempt, Economou had paid $35,000 and claimed he had no more funds. A number of customers objected to the liquidation of the ABT Entities. The Court concluded that no other course of action was possible. As a preliminary matter, the Court noted that since defendants' were enjoined from issuing commercial paper, ABT had lost its only significant source of income. Second, the

Court noted that ABT had generated huge losses over the past few years, leading it to conclude that "[w]ith no source of income, high operating losses, and heavy debts, ABT is no longer a viable operation, and could not be sold." *Id.* at 365. The Court also concluded, at the recommendation of the special master and interim receiver, Mr. Gould, that holders of T-bills and spot commodities had priority over holders of ABT commercial paper, but denied such special status to "reserve account" holders. *Id.* at 368. The Court then appointed Gould as receiver and ordered that all claims against the ABT Entities be filed by April 1, 1987. *Id.* at 369.[3] In a separate order, the Court enjoined defendants from contacting any of the ABT customers without first receiving Court approval in light of misleading "bulletins" sent to the customers.

The Second Circuit affirmed the Court's appointment of a receiver to prevent dilution of ABT's commercial paper assets. 830 F.2d 431, 436 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 1118, 99 L.Ed.2d 278 (1988).[4] The Court of Appeals also affirmed the Court's freeze on ABT assets, the contempt convictions, and the Court's order prohibiting direct communication with customers without first obtaining Court approval. *Id.* at 438–43.[5]

At the hearing on the motions now before the Court, two persons testified. The first was Mr. Benjamin Bayoneto, a certified public accountant who has worked for the ABT Entities since August, 1984. He served as an accountant and as administrative assistant to Economou, with responsibility for bookkeeping, account receivables, payments on accounts and handling general administrative work. Since the appointment of Gould as Receiver, Bayoneto has remained with ABT as an accountant. Mr. J. Paul Morgan, a chartered accountant with Coopers & Lybrand, prepared the

---

**3.** The "bar date" was subsequently extended on various occasions such that October 6, 1988 was the final bar date.

**4.** The Second Circuit criticized the use of an equity receiver to effect a liquidation of the ABT Entities, noting that bankruptcy, not receivership, is the preferred method of liquidation. *Id.* As in previous cases, the Second Circuit did not

order the filing of a bankruptcy petition because the liquidation was already well under way. *Id.* at 438.

**5.** The Court of Appeals affirmed on all issues before it, with the exception of dismissing an appeal of an order denying defendants' the right to amend their answer.

statement of assets and liabilities as requested by the Special Master and Receiver in the summer of 1986. He based his conclusions on a study of financial statements, bank records, computer lists, tax returns and discussions with ABT personnel. ABT records were found in a state of disarray, in part because of the seizure of the records by federal agents.

Bayoneto acknowledged that the ABT Entities' principal source of funds came from the issuance of unsecured commercial paper notes. Morgan noted that the entities' largest expense was the payment of the discount to note customers. The solicitation material sent to potential customers said nothing about the financial condition of ABT Service or the related ABT Entities. ABT issued commercial paper in denominations ranging from $250 to $1000. Customers received a cash discount, either subtracted from the face value of the note or by check, if the full face value was paid. Promissory notes were thus issued to customers. Upon maturity, ABT sent the customer notice of maturity and explained that the customer had the option of redeeming the note or rolling the note over, either at the same value, or at a lesser or greater value. This notice also said nothing about ABT's financial condition.

When defendants received money from customers in the commercial paper program, they deposited it into the ABT Service's account at Citibank. All of the ABT operations were financed by ABT Service monies. This money remained available in the account for ABT Service needs, which included redemption of notes, payment of discounts and purchase of commodities. Salaries and other operating expenses were paid out of a separate account at Citibank held in the name of ANE & Co., though ANE & Co. received its income from transfers from the ABT Service account. ANE & Co. existed for the payment of ABT Entities' salaries, payroll taxes and personal draws of the Economous. ABT Service also transferred money to Economou Financial and Development Corp. ("EF & D"), which then handled payment of accounts payable and ABT Entities' advertising. Morgan concluded that, at least since 1984, no monies were due the Economou personally. He acknowledged that any obligations running from ABT to ANE & Co. or to EF & D were not properly recorded, if they did exist. Morgan specifically testified that the ABT records nowhere indicated an amount owing to ANE & Co. for membership benefits or management fees. Similarly, the records also do not indicate a debt to EF & D for advertising.

Excess funds in the ABT Service account would be invested in certificates of deposit from various banks. Outside of monies raised by the issuance of the commercial paper, interest income was the second major source of revenue. Since only excess funds were invested in certificates of deposit, relatively small amounts were earned. Phyllis Economou decided which banks were appropriate for investment. Bayoneto testified that while he was employed at ABT, discounts paid to customers were generally greater than the interest earned on the certificates of deposit, thus creating a "negative spread". No one at ABT disclosed this "negative spread" to customers. Bayoneto also explained that ABT was a membership organization, in which individuals could become members by paying an initial $2500 to $10,000. Membership benefits included the opportunity to participate in ABT programs, to solicit investors for a commission and to receive additional commissions on their own investments.

Morgan's analysis of the financial health of the ABT Entities revealed that as of August 31, 1986, the entities had assets of some $30 million and liabilities of some $85.3 million, resulting in a net deficit of over $55 million. As part of his study, Morgan searched for any loans extended to the Economous and found that funds were loaned to the Economous, none of which has ever been repaid. Specifically, Morgan discovered that ANE & Co. owed approximately $139,000 to ABT as of August 31, 1986, and that EF & D owed roughly $80,-867. Both of these companies were owned and run by Economou. The Economous personally owed ABT Service $309,000 for unspecified advances over a period of sev-

enteen years, none of which funds had ever paid. This debt has been on the books since before 1984. No interest has been paid on any of these loans. The loans to EF & D were used by the Economous for the payment of personal rent obligations; Morgan claims he saw actual checks for this purpose. The monies owed by ANE & Co. stem from personal draws by the Economous in excess of their normal salaries.

Bayoneto examined each of the claims received by the Receiver. He assigned a number to each claim and compared the claimed amounts against the master computer printout prepared to list each of the amounts owed to the customers of the ABT Entities. If the amount claimed by the customer matched the amount indicated on the printout, that claim was set aside. If a discrepancy appeared, Bayoneto and those he supervised checked the actual records stored in the computer and the individual customer files. In checking the files for the accuracy of a claim, Bayoneto looked to all available information, including notes in the files, account records and warehouse records. If the accountants were satisfied that the amount claimed was incorrect, communication was sent to each of the claimants whose claims were found to be discrepant, giving them the opportunity to amend their claims. Those claims that still remained unresolved were given to counsel for disposition.

Twenty-four claims remain discrepant, and are before the Court for disposition. *See* Receiver's Exhibit G. In addition, the Receiver challenges the claims of those with membership and membership commission accounts. Finally, the Receiver challenges the claims made by each of the Economou's.

## DISCUSSION

### 1. Economou's Emergency Application

■ Economou filed an "emergency" application with this Court on June 23, 1989,

seeking four forms of relief: (1) additional discovery by defendants, (2) lifting of the "gag" order that prohibits the Economous from communicating directly with ABT customers without first seeking Court approval, (3) a 90-day enlargement of time, and (4) separation of the Economou claims from the other claims. After hearing Economou's argument, the Court denied his request for an enlargement of time. The Court has granted each side extensions of time in the past when good cause has been shown. In this instance, however, the Economous filed their application less than two weeks before a scheduled hearing, for which notice had been sent to numerous individuals. In addition, the Court did not find any of Economou's arguments compelling, nor did Economou demonstrate good cause for the requested adjournment.

■ Economou's claim for a lifting of the "gag" order is also denied. He presented no compelling reason why he could not comply with the order or why circumstances now might warrant modification of the order. The Second Circuit has previously upheld the order's validity and the Court believes it should remain in effect. *SEC v. American Bd. of Trade*, 830 F.2d 431, 442–43 (2d Cir.1987). Economou's claim for discovery is also denied. He appears to request discovery for the purposes of this motion. Economou has had ample time and opportunity to access the materials he believes are important and presented no compelling reason for the Court to delay consideration of these motions. The defendants have known about the factual matters at issue here certainly since the filing of the Special Master and Interim Receiver's Report in November, 1986. Finally, Economou's request that his claims be considered separately is moot, since the Receiver has filed separate motions and the Court will consider them separately. The fact that the Receiver filed a joint memorandum of law is of no event.[6]

---

**6.** At the Court's request, the Receiver filed on July 21, 1989 a supplemental memorandum concerning the membership account claims. Economou delivered to the Court on July 28, 1989 an affidavit that seeks permission to file supplemental papers in response to the Receiver's papers. Economou filed papers opposing the Receiver's motion prior to the hearing on

## 2. Customers Claims

The Receiver moves to disallow, reduce or subordinate certain claims made by customers of ABT's commercial paper program. The Receiver has divided the customer claims into three categories: (1) claims for amounts in excess of the amounts shown as due to the claimants on the books and records of the ABT Entities ("discrepant accounts"); (2) claims for "membership accounts"; and (3) claims for "membership commission accounts".

### a. Discrepant Claims

■ The Receiver has identified twenty-four claimants whose claims exceed the amount indicated as due in the ABT Entities' records. Each of these individuals received notice of the motion and hearing; only one responded by writing the Court. Attached as Exhibit B to the Notice of Motion (Receiver's Exhibit G) is a list of contested claims, identifying the claimant, the claim number, the amount claimed, the amount shown as due and a one-line explanation for the discrepancy. The Receiver explains in his affidavit that a number of claimants who based their claims on "reserve accounts" held with ABT failed to deduct sums charged against those accounts for warehouse and storage charges incurred in connection with spot commodities held by them in other accounts. Other claimants appear to seek interest on their notes for the period following the maturity date. The Receiver takes the position that all claims should be paid based upon the face value of the note or other instrument issued to the claimant. The Receiver has

used the interest earned on ABT assets in his possession as receiver to defray operating and administrative costs in order to avoid dipping into the assets themselves. The Court agrees that use of the interest in this manner, though possibly unfair to any single individual, benefits the group of creditors as a whole. Recovery on claims therefore will be limited to the face value of the note or instrument. With the exception of the one claimant who wrote the Court, Thomas A. Zimmerman (claim number 7273 and 7315), the Court orders repayment to the claimants in the amounts in accord with the ABT records as indicated on Receiver's Exhibit G.

■ Zimmerman wrote Shea & Gould to protest the determination that he was entitled to $20,750, and not the $21,556 he claimed was due. Zimmerman purchased two notes, one with a face value of $10,500 and the other with a face value of $10,250. Prior to the maturity date of each note, Zimmerman sent ABT the appropriate form to request that the notes be reinvested at the higher face value of $10,750. The maturity dates of the notes was July 18, 1986 (for the $10,250 note) and July 22, 1986 (for the $10,500 note). Zimmerman also sought remittance of $56.25. Zimmerman intended to use the discount he would receive on the new notes in order to cover the amount of the increase in the face value of the notes.[7]

The Receiver explains that the contemplated reinvestment of the two notes never took place. The Second Circuit lifted its stay of this Court's injunction on July 18, 1986, and as a result, all commercial paper

these motions, and the Court has considered them. Economou never requested permission to file additional papers following the hearing.

Economou states that the supplemental memorandum filed by the Receiver concerning the membership account claims brings "a completely new body of law" into the case, and on that basis seeks to justify his request for not only additional papers, but also an extension of time to file such papers. Without question, the supplemental memorandum does not raise any new issues, nor any new areas of law. It merely discusses one discrete part of the Receiver's motions, one that was raised in the initial moving papers filed in May. In addition, nothing in the latest affidavit filed by Economou responds to the issues raised in the Receiver's supplemen-

tal memorandum. Economou merely repeats the arguments made in his papers filed in opposition to the Receiver's motions. Economou's request for an extension to file papers is again denied.

7. Zimmerman desired to purchase two new notes, each with a face value of $10,750. One of the notes was to mature in three months, and, after deduction of the discount, would cost $10,481.25. The other note, to mature in six months, would cost $10,212.50. The two notes together would thus cost $20,693.75. Since the face value of the notes he was returning for reinvestment was $20,750, he sought remittance of $56.25.

activities were frozen as of that date. Consequently, though it was not his fault, Zimmerman was never issued the two $10,750 notes he desired. He is thus entitled only to the face value of the two original notes, $20,750.

### b. Membership Accounts

The Receiver requests that the Court disallow or subordinate the claims of the ABT members. Roughly sixty persons filed claims for membership accounts, totalling approximately $300,000. ABT was organized as a membership corporation without any capital stock. Its articles of incorporation state that none of the revenues or earnings of the corporation shall inure to the benefit of any member. Members were entitled to receive certain discounts and commissions on ABT activities. The Receiver argues that (1) the members' claims do not represent valid debts against the ABT assets, and (2) even if they did represent valid claims, they should be equitably subordinated.

In support of its contention that the members' claims are not valid debts, the Receiver argues (a) that the members do not have a legal claim against ABT assets, since nothing in the corporate papers or membership accounts obligates ABT to repay members' fees, and (b) that no monies are due the members since their memberships should be treated like shares of stock. Just as any claims of shareholders against their dissolving corporation would be given last priority relative to claims of other creditors, so too, argues the Receiver, the claims of the members should not be satisfied until the claims of all other creditors' are satisfied. The Receiver also asserts that the members received the benefits of membership and thus have no claim against the ABT Entities.

Although less certain than in other instances, the Court agrees with the Receiver's arguments. The ABT members stand in a different position than ordinary customers. They received certain benefits not available to other customers and enjoyed something of an inside position, though there is no evidence before the Court to suggest that individual members other than the Economous exercised any control over the ABT Entities. The articles of incorporation themselves note that the members are in a special position. While a member, like a shareholder, has made a certain investment and generally expects the return of principal, the investment nonetheless represents a risk. Delaware Corporation law gives a shareholder last priority relative to creditors when the assets of a dissolved corporation are being dissolved. *See* 8 *Delaware Code Ann.* § 281(b) (Supp.1983) (Corporate assets to be distributed to creditors, and "[a]ny remaining funds shall be distributed to the stockholders of the dissolved corporation."). The Court also agrees that Delaware law considers members of a nonstock corporation analogous to the shareholders of a stock corporation in the context of corporate dissolution.[8] Section 276 of Delaware's Corporation Law mandates that, outside of certain voting procedures, the dissolution of a nonstock corporation should be treated no differently than that of a stock corporation. If members have the right to vote for the election of members of the corporation's governing body, they are to perform the acts necessary for dissolution in the same way that stockholders would. 8 *Delaware Code Ann.* § 276 (Supp.1983). As the Receiver points out, other sections of Delaware's Corporation Law also equate members with stockholder for various purposes. *See* 8 *Delaware Code Ann.* § 141(j) ("... except as may be

---

**8.** The Court has not found any direct case support for or against this proposition. Very few cases have discussed the status of members of nonstock corporations, and none has involved the forced dissolution of the corporation. The Delaware Chancery court has noted in the past that, unlike shareholders, members in a nonstock corporation do not have vested rights in their membership such that they can be inherit-

ed or transferred. *Wier v. Howard Hughes Medical Center,* 407 A.2d 1051, 1054–55 (Del.Ch. 1979). Similarly, the court concluded that membership in a non-stock corporation was not an asset of the estate of a deceased member. *Id.* at 1055. These findings only lend support to the conclusion that the ABT members do not have a claim against the ABT Entities for membership fees paid.

otherwise provided by Certificate of Incorporation, the provisions of this section shall apply to such a [non-stock] corporation, and when so applied, all references to the Board of Directors, to members thereof, and to stockholders shall be deemed to refer to the governing body of the corporation, the members thereof, and the members of the corporation, respectively."). Because the Court finds that the members, under Delaware law, are to be treated similarly to shareholders in these conditions, and since nothing in the ABT corporate documents indicates that the members have valid claims against the ABT Entities, the Court believes that these claims should be paid only in the event that the claims of other creditors are first satisfied. Since this appears highly unlikely, this decision has the effect of disallowing these claims.

#### c. Commission Accounts

Members of ABT earned commissions based on various formulae. Members earned commissions based upon the amount and type of investments made by those they attracted to ABT. The Receiver compared the claims made by members for commission accounts and found that all matched the numbers indicated in the ABT records, except for three. The Receiver recommends that these claims be reformed to conform to the records, and the Court does so.[9]

The Receiver also recommends that the amounts indicated as due on the commission accounts be subordinated on the theory that they derive solely from the members' "equity investment" in the ABT organization. The Court disagrees. It is somewhat anamolous for the Receiver to argue that the members received the benefits of membership and then argue that the commissions owing to members should not be paid. Moreover, the Court did not conclude in the previous section concerning membership accounts that the members had a proprietary interest or had made an equity investment in ABT. Instead, the Court found that Delaware corporate law treats members the same as stockholders for the purposes of dissolution. Even if the membership accounts were equity investments, the commission accounts are not. They represent valid debts of the ABT Entities, and the Court believes that they, with the exception of the Economou claims discussed below, should be satisfied in the same manner as other customers' claims.[10]

#### 3. Economous' Claims

The Economous have filed five claims with the Receiver. Mrs. Economou on her own behalf seeks (1) an unspecified amount due on her ABT membership commission account; (2) recovery of $400 for two $200 checks that the Receiver did not approve for payment, and (3) recovery of $1341.69 due from her reserve account. Mr. Economou seeks (4) approximately $1 million for membership benefits and management fees payable to Arthur N. Economou & Co., Inc. ("ANE & Co.") and (5) approximately $994,000 for advertising commissions and service charges payable to Economou Financial & Development Corp. ("EF & D").

The Receiver resists these claims on both general and specific grounds. As to each of the claims, the Receiver argues that any monies found owing to the Economous should be equitably subordinated to the claims of other non-inside customers. Though often framed in the context of the powers of a bankruptcy court, the Court

---

9. Capt. Andrzej Gnoinski made a claim for $52.50, whereas the record indicates he is owed $65.00. Dr. George M. Norvell made a claim for $368.13, whereas the record indicates he is owed only $26.00. Clarence Jaeger made a claim for $227.52, whereas the record indicates he is owed $228.77.

10. The Court has been persuaded to some degree by the letter of a Joseph Paczkowski, an ABT member, who explained that the amounts earned through commission accounts were often allowed to remain in those accounts as investments. He argues that disallowing the claims of membership commission accounts would be unfair, since members could have chosen to withdraw their money and reinvest it in the ABT commercial paper program. Thus, while those members who invested their money in commercial paper notes would be allowed to recover, those who simply left their money in the commission accounts would not.

has the equitable power to subordinate one claim to another "if it finds that the creditor's claim, while not lacking a lawful basis nonetheless results from inequitable behavior on the part of that creditor." *Kelleran v. Andrijevic*, 825 F.2d 692, 697 (2d Cir. 1987) (Blumenfeld, J., dissenting), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988); *see In re Grant Co.*, 699 F.2d 599, 604 & n. 7 (2d Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). The creditors in question here are the Economous and the corporations they control, the same persons who directed the operations of the ABT Entities. The evidence has mounted throughout the history of this litigation and the hearing held on this motion that the Economous mismanaged the ABT Entities, borrowed money for their own personal use without payment of interest or repayment of principal, and defrauded their customers by issuing the commercial paper notes without informing investors (1) that the ABT Entities were insolvent, (2) that the money was being invested in certificates of deposit earning a rate of interest less than that being paid on the notes, and (3) that the ABT Entities had no other serious source of income, other than the issuing of additional commercial paper. For these reasons, the Court believes that it would be inappropriate to allow the Economous, ANE & Co. or EF & D to recover the over $2 million sought unless and until other creditors were first satisfied. Although this basis would appear to be a sufficient one for granting the Receiver's motion, other independent bases exist for so doing, and the Court will discuss these below.

■ The Receiver also argues that any monies due to the Economous should be used to offset the monies the Economous owe to the ABT Entities. The evidence at the hearing established that the Economous owe the ABT Entities over $500,000, exclusive of interest. According to Morgan, the accountant from Coopers & Lybrand who prepared a report on the assets

and liabilities of the ABT Entities, as of August 31, 1986, ANE & Co. owed the ABT Entities approximately $139,000 for drawings by the Economous in excess of their salaries. Morgan also testified that EF & D owed the ABT Entities $80,867 as of August 31, 1986. The Economous drew this money from the ABT Entities, through EF & D to pay rent on their apartments. Neither of these debts have been repaid. In addition, the Economous owe another $309,000 directly to ABT Service, a debt that has existed on the books since before 1984, that has never been repaid, and for which no interest has ever been paid. The Receiver identified this debt in his report and recommendation to the Court in November, 1986, and the Economous have not provided any evidence to the contrary since that time. *See SEC v. American Bd. of Trade*, 654 F.Supp. 361, 364 (S.D.N.Y.), *aff'd and modified*, 830 F.2d 431 (2d Cir. 1987). Indeed, Economou has admitted to Gould that he borrowed over $500,000 from the ABT Entities, ANE & Co. and EF & D. Letter from Economou to Gould, dated November 28, 1986 at 8, attached as Exhibit 4 to Economou Memorandum. The Economous thus owe the ABT Entities over $500,000, exclusive of interest. Thus, any monies that might be due to them should be first used to offset this amount.[11]

The Receiver wrote both Mr. and Mrs. Economou separately on May 8, 1987, in response to their claims, informing them that they should contact his office to make arrangements for access to all the books and records of the ABT Entities. Economou wrote back to Gould outlining the documents he had provided to the Receiver and requesting that Gould provide him with specific guidelines indicating exactly what Economou must provide. Mrs. Economou similarly wrote Gould by letter dated June 5, 1987, asking for the Receiver to provide specific guidelines for her to follow in substantiating her claims. Gould did not respond to either letter, nor does he mention

11. The Economous argue that the amount they have "borrowed" is less than the amount earned by Economou's two companies. This statement is true, unless interest is calculated into the

scenario. With interest, the personal debt of the Economous to the ABT Entities could approach or exceed the $2 million they now claim.

or discuss them in his papers. Though the Court wonders why no response was made, the Economous have had ample opportunity, including the hearing on these motions, to substantiate their claims, and any failure to do so cannot be blamed on the Receiver.

The Court will now discuss each of the individual claims in turn.

### a. Mrs. Economou's Membership Commission Account (Claim 7450)

Mrs. Economou filed this claim for the amounts she claims are due her for ABT Membership Account # 0002. She did not specify the amount due, claiming that she could not do so because the Receiver illegally seized all relevant papers. She does not appear to have substantiated this claim in any way. The Receiver investigated this claim and concluded, based on documents prepared by Coopers & Lybrand, that Mrs. Economou is owed $77.50 in unpaid commissions. *See* Exhibit G to Gould Aff. II. Mrs. Economou has not disputed this conclusion, and the Court will therefore find that she is owed $77.50 for her membership commission account. Nonetheless, this money is not to be paid. First, as described above, the Court has determined that the membership accounts are not valid debts of the ABT Entities, and that members have last priority for recovery of their membership fees. Second, even if the amount owed to Mrs. Economou were to be paid, this claim should be equitably subordinated to the claims of other customers.

### b. Mrs. Economou's Two $200 Checks (Claim 7449)

The Receiver acknowledges that these checks were written to the order of Mrs. Economou on ANE & Co. checks for drawings during the month of August, 1986 and that they were disallowed pursuant to the Receiver's authority to monitor all expenditures. The Court agrees that this claim should also be subordinated or used to offset the amounts the Economous owe.

### c. Mrs. Economou's Reserve Account (Claim 7434)

The Receiver acknowledges that Mrs. Economou's reserve account indicates a balance due of $1,341.69, but this claim too will be subordinated and used to offset the amounts owing as described above.

### d. ANE & Co.'s Claim for Membership Benefits and Management Fees (Claim 7453)

Economou claims approximately one million dollars on behalf of ANE & Co. for membership benefits and management fees. The Court disallows this claim for a number of reasons. First, defendants have not documented the claim. The ABT records, according to Morgan, do not indicate that such a debt exists or ever existed. In fact, the records indicate that ANE & Co. owes ABT Service some $75,000. The tax returns of ANE & Co. for years 1981 through 1985 also do not list any accounts receivable. Economou blames the lack of accurate records on the "slipshod" record keeping of his accountants, who well knew, he claims, of the accrued, unpaid cash earnings of the two Economou corporations, ANE & Co. and EF & D.

Economou complains in his papers that he sent various documents to Gould in an effort to document this claim, but the Receiver and his accountants were apparently not convinced. Economou wrote Gould a letter dated November 28, 1986 explaining his position as to ANE & Co.'s claim for approximately one million dollars. Economou responds to Gould's claim that the books do not demonstrate the presence of the claimed debt by arguing that the books were not current and need to be updated. Economou attempts to blame accounting irregularities on his accountants.

ANE & Co. held a "seat" in the ABT, giving it the right to charge management fees for any supervised trading programs developed and managed for customers. Market transactions were recorded by ABT Clearing Corp. ("ABT Clearing"), an ABT subsidiary. From 1976 to 1986, Economou claims that ANE & Co. accumulated substantial credits in its account with ABT

Clearing, reflecting ANE & Co.'s accumulated management fees, earned brokerage commissions and its 10% commissions on premiums charged to and collected from its customers related to activities in the supervised trading programs in foreign currency options which ANE & Co. developed and managed. Economou claims that ANE & Co. had accumulated a credit balance with ABT Clearing totalling approximately $870,000 through early 1983. He claims that another $150,000 in credits were accumulated through September, 1986. Economou also stresses that the amount of unpaid earned commissions can be reconstructed by analyzing the accounts of the customers who participated in the supervised trading programs. By recreating each of the customers' transactions, the exact amount due could be calculated. Economou explicated the logic of his position: ANE & Co. was a member of ABT, it developed certain customer trading programs (FX–1, FX–2, FX–0), it is entitled to membership benefits, it was given discretionary trading authority in writing by its customers, who agreed to pay a management fee, it did manage the customers' accounts and it has not withdrawn the amount of credits accrued. Gould's only response to these arguments has been testimony that the books and records of the ABT Entities do not indicate the claimed debt. The Receiver has not, however, responded to the argument that the monies are due, even if not accurately recorded. The Court is therefore not in a position to conclude that the debts are not due.

■ Two reasons nonetheless compel the Court to grant the Receiver's requested relief. First, as the Receiver points out, ANE & Co. is also subject to the receivership. Economou protests that ANE & Co. is a customer of ABT Service like any other and should be treated accordingly. The Court disagrees. ANE & Co. is not a customer like any other. Economou, who is certainly not in the same position as other customers, completely controlled ANE & Co. and used it for his own personal advantage. The record indicates that Economou used ANE & Co. to draw funds in excess of his salaries, and that all monies expended

by ANE & Co. came from ABT Service. ABT Service certainly did not regularly transfer funds to "normal" customers. ANE & Co. also paid salaries and performed other corporate functions for the benefit of ABT Service. The Court therefore concludes that ANE & Co. cannot be considered a customer like any other. Therefore, the Court believes that the receivership over ANE & Co. remains proper. It follows that disbursement of funds from ABT Service to ANE & Co. would serve no purpose, since the funds received by the latter would remain subject to the receivership, held for ultimate distribution to ABT customers. Since the claims far exceed the available assets, having the right hand pay the left hand, when the money is to be distributed to others, would amount to an exercise in futility.

Finally, the Court believes that distribution of funds to ANE & Co., and thus to Economou, would not be fair as a matter of equity. As discussed above, the principle of equitable subordination allows the Court to subordinate the claims of one creditor to those of others. The Court firmly believes that the individual customers of the ABT Entities should be allowed to recover first. Thus, even if ANE & Co. had a valid claim, a question which the Court does not decide, and even if ANE & Co. were not in receivership, the Court concludes that as a matter of equity, ANE & Co.'s claims should be subordinated to those of the other individual customers.

e. *EF & D's Claim for Advertising Commissions and Service Charges (Claim No. 7454)*

Economou also filed a claim on behalf of EF & D in the amount of $994,000. Gould makes arguments identical to those made in relation to the ANE & Co. claim, namely that the books do not indicate such a debt exists, that tax records do not indicate such a debt exists and that EF & D owes money to ABT Service. Economou has not responded by explaining the nature of the debt, nor does the record indicate any basis for concluding that the debt exists. The

Court therefore grants the Receiver's motion to disallow this claim.

Even if the claim were not disallowed, the Court would grant the Receiver's motion for the reasons stated above in relation to ANE & Co. In particular, EF & D, also owned by Economou, cannot be considered a regular customer of ABT and properly remains in receivership. Any debts justly owing to EF & D should be subordinated for the reasons given above.

### CONCLUSION

For the reasons stated above, the Court grants the Receiver's motion to reduce the discrepant claims to match the amount due indicate in the ABT records. The motion to disallow the members' claims is granted, while the motion to disallow commissions claims is denied. The Court also disallows and equitably subordinates the claims by each of the Economous.

SO ORDERED.